UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

          Plaintiff,

v.                                                          No. 1:21-cr-40

CHRISTOPHER ALLAN BODEN, a/k/a "Captain,"          HON. ROBERT J. JONKER
LEESA BETH VOGT, a/k/a "Lis Bokt,"                 Chief United States District Judge
a/k/a "Moose," and
DANIEL REYNOLD DEJAGER,
a/k/a "Daniel Reynold," a/k/a "Daniel Miester,"
a/k/a "Danichi,"

          Defendants.

_____/

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

The United States respectfully opposes the defendants' motion to dismiss Counts 1

through 14 of the Indictment.  The defendants make two arguments in contending they were not

running an illegal money transmitting business: Bitcoin is not "money," and exchanging bitcoin

for cash is not "transmitting."[1]  Both arguments fail because Congress and the Department of

Treasury have said otherwise, as courts have consistently found.

---

[1] The government here defines some terms and conventions for purposes of this brief.
The government uses a capital "B" to refer to the system of cryptocurrency and a lowercase "b"
to the individual units of account.  The government also uses "virtual currency" and
"cryptocurrency" interchangeably here, as while those terms have slightly different definitions,
they apply equally to Bitcoin and the other virtual currencies The Geek Group sold or offered to
sell (the transactions overwhelmingly involved Bitcoin, but Boden at least offered to deal in
other virtual currencies).  Finally, the government uses "exchanger" to refer to the defendants'
unlawful conduct—"a person engaged as a business in the exchange of virtual currency for real
currency, funds, or other virtual currency"—while an "exchange" is a lawfully registered service
for purchasing or selling cryptocurrency, such as Coinbase.  *See* Dep't of the Treasury FinCEN
Guidance, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or*

## I.      BACKGROUND

In contrast to the pure motives the defendants cite in their brief, Defendant Christopher Boden was a Bitcoin money launderer and loan shark, and Defendants Daniel DeJager and Leesa Vogt knowingly and willingly participated in the scheme charged in the Indictment by assisting him in executing financial transactions and concealing the activity from the regulated banking system.  An overview of some of the government's intended proofs provides useful context to understand the allegations in the Indictment.

In early 2017, Boden decided that his non-profit entity, The Geek Group, the name of which he later changed to the National Science Institute, should start selling Bitcoin.  The Geek Group was supported until then primarily by membership fees, mostly paid using PayPal.  Boden realized that both he and his co-defendants could make more money by acting as an unlicensed money transmitter.

The Geek Group installed a Bitcoin ATM in the lobby and put a sign in the window to attract customers as Bitcoin's popularity grew.  When a customer would enter the building to buy bitcoin, however, a staff member would steer the customer away from the ATM and to the counter for an illicit transaction.  Boden personally conducted these transactions, as did the other defendants.  Vogt, then Boden's girlfriend, and now his wife, served on the board of The Geek Group and as its executive director and bookkeeper.  DeJager was responsible for purchasing bitcoin from legitimate exchanges and sending it to Boden for the counter sales.  After use of a PNC Bank account became too cumbersome for DeJager, who lived in Washington State, the defendants set up a Chase Bank account so that they could more easily transfer the cash

---

*Using Virtual Currencies*, FIN-2013-G001, at 2 (Mar. 18, 2013) (hereinafter "2013 FinCEN Guidance"), *available at* https://www.fincen.gov/sites/default/files/shared/FIN-2013-G001.pdf.

proceeds, less profits, back to DeJager to buy more bitcoin.  Vogt deposited cash proceeds from the sale of bitcoin and directed Jeremy Swink to do so as well.

Federal agents searched Boden's Facebook account, where he conducted business with customers and the defendants coordinated the scheme.  For example, Vogt and DeJager discussed setting up the Chase account on May 9, 2017:

| | |
|---|---|
| VOGT: | Not sure if you knew, but we can deposit to chase without being on the acct |
| DEJAGER: | Ok. I just worry about too many questions too :P |
| VOGT: | Yeah they don't really care. . . . I have Jeri do my deposits and they've never raised an eyebrow |
| . . . . | |
| DEJAGER: | Please deposit Chris's Bitcoin purchases here |
| VOGT: | Will do! |

The Facebook records include messages between Boden, Vogt, DeJager, and Swink recording cash deposits, which correspond to the deposits in the bank records.

All of the deposits, based on the government's review of the approximately $740,000 in cash deposits, were structured to avoid reporting requirements and to conceal the scheme from the banking system and the government.  The Facebook messages reveal the defendants planning the structuring.  For example, on May 9, 2017, the records show this exchange:

| | |
|---|---|
| DEJAGER: | I only worry about that magic 10k |
| BODEN: | I would send it to you in pieces, we can't cross the line. |
| BODEN: | New rule, no transactions over 5k |
| DEJAGER: | though they apprently [sic] have algorithms that look for transactions that are trying to skirt the 10k rule too. |

Another example from May 10, 2017:

| | |
|---|---|
| VOGT: | I have 10k, and Chris wants to take care of it asap.  The bank has |

already close [sic] today, what would you like me to do?

. . . .

DEJAGER:    and because it sounds like it's exactly 10k, maybe send a few k by paypal?

VOGT:       3 sound good?

DEJAGER:    sure

Early in the conspiracy, Vogt and DeJager worked to optimize the ways to transfer money to avoid scrutiny from the banks.  For example, on May 31, 2017:

DEJAGER:    (I don't know the exact limit, but I seem to recall chris doing a 1k tx a while back and it worked flawlessly, whereas 3k didn't.

. . . .

VOGT:       Well for the next couple of smaller ones we'll try that and see if we can find its happy spot

The same day, Vogt, DeJager, and Boden discussed how the bank had flagged their accounts as fraudulent.  On June 8, 2017, Vogt reported to DeJager that "Google just cancelled my transaction."  The defendants often wrote "#FUCKBANKS!" or similar exclamations to express their frustration with the difficulty of moving large sums of cash in the banking system.

On June 13, 2017, Vogt advised that she had figured out how to move up to $8,000 per day.

BODEN:      The limit is 8?

VOGT:       We can do up to 8 per day overall in activity, and sometimes its less.  it's a surprise.

BODEN:      ok, let's send $7500 today then, for safety

In an August 4, 2017, exchange with another individual, Boden and the person conferred about how to respond after their original bank account, the PNC account, was flagged for suspicious activity:

V.C.:       just got a call from [S.H.] at PNC

4

. . . .

V.C.:          he wants to know about the massive cash deposits going on in your account

. . . .

V.C.:          money laundering, is what I told him

. . . .

V.C.:          I actually told him noting [sic]

BODEN:         FUC K FUCK FUCK FUCK FUCK

. . . .

V.C.:          [S.] will be calling you

BODEN:         [S.] is a great guy and a friend, we like him

V.C.:          he is still an officer of the bank

. . . .

V.C.:          there was a big money laundering arrests around e-currency worldwide

BODEN:         ok, but we're not laundering money, lol

V.C.           of course not . . . I'll take your word for it

BODEN:         I sell bitcoin.

. . . .

V.C.:          over 9k feds look at

BODEN:         yes

The same day, Boden and Vogt conferred about the issue:

BODEN:         When we buy Bitcoin, does it go through my personal account, or on the separate thing we have for Danichi

VOGT:          Usually it goes straight to the Chase account set up for him.

BODEN:         ok

5

VOGT:          [S.] pnc [phone number]

During the conspiracy, at least one legitimate exchange closed DeJager's account based on suspicious transactions.  When DeJager asked Boden what to tell the exchange, Boden wrote, on September 12, 2017, "If they knew we were selling it, they would raise hell," and the two brainstormed how to lie about the activity.  On September 15, 2017, DeJager wrote that two bitcoin transactions flagged by the exchange "were sent directly to bitmixer," a mixing service, and "[i]t's a little disconcerting that they can tell."[2]  On November 14, 2017, when another exchange inquired about suspicious cash transfers, conversions, and withdrawals, rather than acknowledging he was an exchanger, DeJager claimed to "have some rather lucrative . . . contracts" from software development and he was "choosing to invest in cryptocurrencies."

Agents recovered messages between Boden and various customers indicating he did not require any personal information, sometimes called know-your-customer ("KYC") information in Bank Secrecy Act ("BSA") enforcement actions, in order to conduct a transaction.  Further, he marketed himself to customers as the source for bitcoin when they didn't want that information known.  The Facebook messages also include, among other incriminating evidence, discussions between Boden and DeJager, between DeJager and Vogt, between all three defendants, and between Boden and others, in which the parties discuss the illegality of selling bitcoin without a license, laundering bitcoin so it was "clean," and the importance of keeping banking transactions under certain thresholds below $10,000.  To give a few examples, on March 4, 2017, the two men discussed laundering:

---

[2] "Mixing," also called "tumbling," bitcoin involves routing bitcoin through multiple addresses, and/or comingling it with other bitcoin, to make it difficult or impossible to trace the origin of the funds.  This can be done by an individual, and there are also online services that mix and tumble bitcoin. *See, e.g.*, Wikipedia, *Cryptocurrency tumbler*, https://en.wikipedia.org/wiki/Cryptocurrency_tumbler (last visited Aug. 11, 2021).

BODEN:         This will be cleaned?

DEJAGER:       it is aleady clean.

. . . .

DEJAGER:       it is sitting in my post-bitmixer wallet in mycelium

BODEN:         ahhhhhh[] Excellent.

On May 9, 2017, DeJager wrote to Boden, "i'm mixing now."  On June 8, 2017, DeJager wrote,

"I have 1.6 mixed, and another .5 waiting to be mixed."  On August 7, 2017:

BODEN:         You mixed? . . . How?

DEJAGER:       manually. sending random amounts to new addresses.joining,
               splitting. minimum of 5 hops. (i've heard CB only watches 3 hops)

. . . .

BODEN:         So, this mixing, is it all yours or outside services?

DEJAGER:       all me. . . . I can't afford to keep trying other services…

BODEN:         I deeply support the idea of you/us creating our own tumbler

Boden also marketed "clean" bitcoin to customers.  For example, from March 23 to 25,

2017:

BODEN:         I am happy to sell you as much as you like.  Or, if you buy it from
               somewhere else, I am happy to anonymize it for you.
. . . .

PERSON A:      that was a question I had , so by creating a new account clean
               account in that same app, it isn't connected any way with the main
               app, I was IDed with

BODEN:         They already have you ID'd, that one's dirty no matter what. . . . I
               can make any coin anonymous.
. . . .

PERSON A:      I can buy at Coinbase.

. . . .

> BODEN:        It's up to you.  I sell clean.  That's why people buy from me and
>               not CB

Boden similarly wrote to another prospective customer, on April 28, 2017, "Then you

have dirty coin . . . . If you buy coin from a place that requires ID, it's not anonymous. . . . It's

'Dirty' . . . . Which means, it's useless. . . . . I only sell clean coin, and I only sell it

anonymously."

The records also make plain that Boden knew about the regulatory requirements.  For

example, on November 4, 2017:

> BODEN:        Do I have a problem?
>
> PERSON B:    Look up title 31 section 5330
>
> . . . .
>
> PERSON B:    Short answer: you have to register with the secretary of treasury.
>               And record certain client information for transactions > $10K.

Two days later, Boden wrote to DeJager that if they sold more than $1,000 at a time, "I'd better

be damn sure they're not a fed."

These messages, and many others like them, are representative of how Boden and his co-

defendants ran the unlicensed business.  The Geek Group sold to undercover agents a number of

times, and three of the transactions involved more than $10,000 each.  In one recorded deal,

Boden told one undercover agent that he "came to the right place" where it is a cash-only

business and there is "no bullshit."  He made similar representations in interactions with a second

undercover agent, who was posing as a cocaine dealer.  Boden described drug dealers as his

"exact favorite kind of client," "guys . . . who . . . make[] a living out of knowing how to keep

your mouth shut."  He emphasized to that agent that he did not collect KYC information: "Cash,

no cards, no checks, I don't need your name, I don't need your ID."  Later he emphasized this

point: "You can call me any time day or night, no bullshit.  Like you just call me, I don't need your name, I don't need your ID, I don't need your address."  And a third time in the same transaction: "I don't need your ID or your name because you got cash."

In a second transaction with that agent, Boden professed, "what I want to do is figure out how to be the bitcoin empire for you and everybody else in your world.  I want to be the guy like that."  In that interaction and later ones, Boden solicited the agent to collect a purported $500,000 debt related to a bitcoin loan.  Boden authorized the agent to use any means necessary, short of murder, to recover the money, in exchange for 20% of the proceeds.  "What happens to him, I don't give a shit . . . [Y]ou kill him, he ain't gonna pay me.  And, and I don't need him dead; he's dumb. . . . How you handle this, this is your world.  I care that I get my money back.  Beyond that, it's whatever's most efficient for you."

After federal agents searched The Geek Group, Boden broadcast a video on YouTube in which he confessed to knowing the Bitcoin business was illegal.  Among other admissions, he said: "It's going to fucking destroy my life, and it should, that's how it works, actions have consequences"; "I sold bitcoin, I did it very publicly . . . to a lot of different people"; "I fucked up . . . I made a bad decision, and I'm going to pay for it"; "actions have consequences, I did a bad thing, I made a bad choice, I sold bitcoin, and I like shouldn't have done it, and that's how it is"; "selling bitcoin is illegal if . . . you're selling bitcoin as a job . . . you have to have a bunch of licenses for that, and I didn't"; "what happened is . . . against the law"; "life as I know it is over"; "I might go to prison, like that's a real possibility"; "I sold bitcoin and I shouldn't have done it"; and "I won't go to jail, I'll go to federal prison."

On February 24, 2021, a federal grand jury indicted the defendants, collectively, on 28 counts.  The Indictment alleges the unlicensed business was operated between March 2017 and

December 2018.  (PageID.1, 5.)  Relevant to the pending motion, the first 14 counts of the

Indictment allege conspiracy to operate an unlicensed money transmitting business (Count 1),

operating an unlicensed money transmitting business (Count 2), conspiracy to launder money

(Count 3), and money laundering (Counts 4 through 14).  (PageID.1–9.)  The government

acknowledges that these 14 counts are contingent on surviving the motion to dismiss.  The

remaining 14 counts of the Indictment, unchallenged by the defendants, allege money laundering

(Counts 15 through 17, based on a different theory and statutory provision than Counts 4 through

14),[3] structuring (Counts 18 through 27), and attempted collection of debt by extortionate means

(Count 28).  (PageID.10–16.)

## II.    LEGAL STANDARD

Federal Rule of Criminal Procedure 12(b)(3)(B)(v) requires a defendant to bring a motion

before trial if he alleges one or more counts in an indictment fail to state an offense.  In

"reviewing [a motion to dismiss] counts in an indictment, [courts] read the indictment as a

whole, accept the factual allegations as true, and construe those allegations in a practical sense

with all of the necessary implications."  *United States v. Reed*, 77 F.3d 139, 140 n.1 (6th Cir.

1996) (en banc) (citing *United States v. Barker Steel Co.*, 985 F.2d 1123, 1125 (1st Cir. 1993)).

The Court's review is limited to determining if the indictment is "valid on its face."  *Costello v.*

---

[3] Counts 4 through 14 allege that Boden and DeJager mixed bitcoin to conceal its origin and promote the business, 18 U.S.C. § 1956(a)(1)(A)(i), (B)(i), and rely on the specified unlawful activity of the 18 U.S.C. § 1960 offense.  Boden and DeJager expressly discussed mixing bitcoin in Facebook messages as noted above, and the blockchain shows mixing activity. Counts 15 through 17 allege violation of the "sting" money laundering provision, 18 U.S.C. § 1956(a)(3)(B), based on the transactions with the undercover agent.  Thus, the defendants are mistaken in their assertion that "three purchases of bitcoin with simulated drug money ultimately form the basis for 17 of the Government's 28-count Indictment," (PageID.111); those purchases are alleged in three of the counts.  Additionally, there is evidence that some other customers— not the undercover agent—were using the bitcoin to buy marijuana.

*United States*, 350 U.S. 359, 363 (1956).  Put another way, a district court reviewing a motion to dismiss is evaluating a "question of law rather than fact," such as where "the defendant is arguing that as a matter of law the undisputed facts do not constitute the offense charged." *United States v. McMichael*, 350 F. Supp. 3d 647, 650 (W.D. Mich. 2018) (quoting *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976), and *United States v. Vertz*, 40 F. App'x 69, 70 (6th Cir. 2002)) (internal quotation marks omitted).  The defendants' motion challenges only the legal issues of whether Bitcoin is money and whether exchanging is transmitting.

## III.    ARGUMENT

The defendants argue that operating as a Bitcoin exchanger is not unlicensed money transmitting both because Bitcoin is not "money" and exchanging is not "transmitting."  These arguments are incorrect because Congress and the Department of Treasury have defined unlicensed money transmitting to cover cryptocurrency and exchanging.  The defendants' argument that ordinary usage supersedes promulgated law is unpersuasive both because lawmakers are free to define the terms they use, and, even if they weren't, the ordinary definitions capture the conduct alleged.

An "unlicensed money transmitting business" is defined by statute as a business that "affects interstate or foreign commerce in any manner or degree," and either (A) "is operated without an appropriate money transmitting license" if such is a crime under state law, (B) "fails to comply with the money transmitting business registration requirements" of 31 U.S.C. § 5330 "or regulations prescribed under such section," or (C) "otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity."  18 U.S.C. § 1960(b)(1).  "[T]he term 'money transmitting' includes transferring funds on behalf of the

public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2).

Boden and DeJager were charged under both the (B) and (C) provisions, the latter based in part on the undercover transactions.  Vogt was charged under the (B) provision only. (PageID.5.)  That (B) provision refers expressly to 31 U.S.C. § 5330, the BSA, which provided at the time of the offense conduct:

> (1) Money transmitting business.—The term "money transmitting business" means any business other than the United States Postal Service which—
>
>> (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments *or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system* or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system; . . . .
>
>> (2) Money transmitting service.—The term "money transmitting service" includes accepting currency or funds denominated in the currency of any country and transmitting the currency or funds, *or the value of the currency or funds, by any means* through a financial agency or institution, a Federal reserve bank or other facility of the Board of Governors of the Federal Reserve System, or an electronic funds transfer network.

31 U.S.C. § 5330(d) (2017) (emphasis added).[4]  Money transmitting businesses are required to register with the Secretary of the Treasury.  31 U.S.C. § 5330(a).

---

[4] The statute was recently amended to import some of the regulatory definitions into the statute.  *See* the William M. (Mac) Thornberry National Defense Authorization Act of 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4552–53 (Jan. 1, 2021).  In part because 18 U.S.C. § 1960 refers expressly to violation of the regulations prescribed under § 5330, the amendment does not affect the legality of the defendants' conduct or present any ex post facto concerns here.  *See Weaver v. Graham*, 450 U.S. 24, 29 (1981); *Kyles v. Chester*, 457 F. App'x 780, 783 (10th Cir. 2012); *United States v. Delco Wire & Cable Co.*, 772 F. Supp. 1511, 1515 (E.D. Pa. 1991).  As explained below, operating an unregistered Bitcoin exchanger was a crime under § 1960 in 2017 and 2018, and it remains illegal today.  For clarity, the government addresses the operative statute and regulations at the time of the offense conduct in 2017 and 2018.

The Secretary of the Treasury is authorized by Congress to promulgate regulations under the BSA and to delegate duties and powers within the Treasury Department.  *See* 31 U.S.C. §§ 321(b), 5318.  One of the regulations prescribed under § 5330 is 31 C.F.R. § 1022.380, which requires "money services businesses" ("MSBs") to "register with FinCEN," the Financial Crimes Enforcement Network, a division of the Treasury Department.  31 C.F.R. § 1022.380(a)(1); *see* Treasury Order 180-01, Financial Crimes Enforcement Network, 67 Fed. Reg. 64697-01 (Oct. 21, 2002) (delegating authority to administer the BSA to FinCEN).  *See also* 31 U.S.C. § 310(b)(2) (delineating the duties and powers of the Director of FinCEN).  Subsection (e) of that regulation is explicit that 18 U.S.C. § 1960 is "a criminal penalty for failure to comply with the registration requirements of 31 U.S.C. § 5330 or this section."  Further, "[m]oney services business" is defined in the regulations as including a "[m]oney transmitter."  31 C.F.R. § 1010.100(ff)(5).

A "[m]oney transmitter" is:

(A) A person that provides money transmission services.  The term "money transmission services" means the acceptance of currency, *funds, or other value that substitutes for currency* from one person and the transmission of currency, funds, or other value that substitutes for currency *to another location or person by any means*.  "Any means" includes, but is not limited to, through a financial agency or institution; a Federal Reserve Bank or other facility of one or more Federal Reserve Banks, the Board of Governors of the Federal Reserve System, or both; an electronic funds transfer network; or *an informal value transfer system*; or

(B) *Any other person engaged in the transfer of funds*.

31 C.F.R. § 1010.100(ff)(5)(i) (emphasis added).  The conduct here clearly fits within this definition, because the defendants were "engaged in the transfer of funds" and alternatively they were accepting and transmitting "value that substitutes for currency."  As FinCEN wrote in its 2013 guidance, "an administrator or exchanger [of virtual currency] is an MSB under FinCEN's

regulations, specifically, a money transmitter, unless a limitation to or exemption from the definition applies to the person."  2013 FinCEN Guidance, at 4.[5]

While these provisions contain multiple definitions related to "money transmitting," courts have generally construed them together, and broadly.  *See United States v. Banki*, 685 F.3d 99, 113 (2d Cir. 2012) ("Section 1960 defines 'money transmitting' broadly[.]"); *United States v. Harmon*, 474 F. Supp. 3d 76, 101 (D.D.C. 2020) ("'[M]oney transmitting[]' . . . is broadly defined at § 1960(b)(2)." (first alteration in original)); *United States v. $215,587.22 in United States Currency*, 306 F. Supp. 3d 213, 219 (D.D.C. 2018) (noting that "[c]ourts have broadly construed the definition of both a 'money transmitting business' and a 'financial institution'");[6] *United States v. E-Gold, Ltd.*, 550 F. Supp. 2d 82, 92 n.10 (D.D.C. 2008)

---

[5] The regulations exempt specific categories of conduct, not applicable here, from this definition, for example, those who accept funds in connection with selling goods or services.  31 C.F.R. § 1010.100(ff)(5)(ii)(F).  The defendants are incorrect, therefore, in their "absurd results" example of a gas station attendant giving change for a $5 bill.  (PageID.123.)  The attendant would not be a money transmitter for several reasons—among them, the de minimis amount of the single, profit-free transaction in the same currency, and the resulting fact that the gas station attendant is not in the "business" of money transmitting; instead, the gas station attendant accepts money in connection with the sale of gas.  *See* 31 C.F.R. § 1010.100(ff)(8)(iii) ("money services business" does not include "[a] natural person who engages in [activities including money transmission] on an infrequent basis and not for gain or profit").

[6] Under the BSA, a "money transmitting business" is one that, in addition to other requirements, is "required to file reports under section 5313."  31 U.S.C. § 5330(d)(1)(B).  Section 5313 imposes a reporting requirement for "a domestic financial institution," with certain exceptions not applicable here.  31 U.S.C. § 5313(a).  A "domestic financial institution" is a financial institution that takes "an action in the United States," and a "financial institution" included "a currency exchange"; "any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system"; certain other businesses designated by the Secretary of the Treasury, per regulation, that "engage[] in any activity . . . similar to, related to, or a substitute for any activity in which any business described in this paragraph is authorized to engage"; and certain other businesses "designated by the Secretary whose cash transactions have a high degree of usefulness in criminal, tax, or regulatory matters."  31 U.S.C. § 5312(a)(2)(J), (R), (Y), (Z) (2017).

("[T]here is virtually no substantive difference, nor did Congress intend there to be a substantive difference, between the terms 'money transmitting' in Section 1960 and 'money transmitting business' in Section 5330."); *id.* at 96 (citing statutory language as well as legislative history to confirm "the inclusiveness of the term 'money transmitting business' under Section 5330").

### A.  Bitcoin Is Money or Funds for Purposes of 18 U.S.C. § 1960.

Cryptocurrency generally, and Bitcoin specifically, is, "funds," or at a minimum, "value that substitutes for currency."  Therefore, Bitcoin is "money" for the purposes of § 1960, and courts have essentially uniformly so held.  *See Harmon*, 474 F. Supp. 3d at 89–90; *United States v. Ologeanu*, No. 5:18-CR-81, 2020 WL 1676802, at *10–11 (E.D. Ky. Apr. 4, 2020) (collecting cases and concluding that "the federal district courts have unanimously and univocally concluded that Bitcoin constitutes 'money' and 'funds'" (internal quotation marks omitted)); *United States v. Stetkiw*, No. 18-20579, 2019 WL 417404, at *1–2 (E.D. Mich. Feb. 1, 2019) (collecting cases and concluding that "District Courts have repeatedly found that Bitcoin constitutes 'money' and 'funds' within the meaning of 18 U.S.C. § 1960"); *United States v. Mansy*, No. 2:15-cr-198, 2017 WL 9672554, at *1 (D. Me. May 11, 2017) (collecting cases and announcing that "[t]he Court . . . adopts the persuasive analysis of the majority of the district courts that have recently addressed this question"); *United States v. Lord*, No. 15-00240, 2017 WL 1424806, at *1, *4 (W.D. La. Apr. 20, 2017) (denying, based in part on the 2013 FinCEN Guidance, motion to withdraw guilty plea by Bitcoin exchangers); *United States v. Murgio*, 209 F. Supp. 3d 698, 707– 10 (S.D.N.Y. 2016) ("[T]he Court concludes that 'funds,' for the purposes of § 1960, means pecuniary resources, which are generally accepted as a medium of exchange or a means of payment.  Applying that definition here, it is clear that bitcoins are funds within the plain meaning of that term.  Bitcoins can be accepted as a payment for goods and services or bought

directly from an exchange with a bank account." (internal quotation marks and alterations omitted)); *United States v. Budovsky*, No. 13cr368, 2015 WL 5602853, at *13–15 (S.D.N.Y. Sept. 23, 2015) ("The *Faiella* court found that Bitcoin as a virtual currency qualified as 'funds' under the statute, since it can 'be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions.'  For these same reasons, LR qualifies as 'funds' for purposes of § 1960." (citation omitted) (quoting *United States v. Faiella,* 39 F. Supp. 3d 544, 545 (S.D.N.Y. 2014))).  *See also United States v. Green*, No. 2:19-cr-00525, ECF No. 30 (D.N.J. Feb. 10, 2020) (order denying motion to dismiss); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 569–70 (S.D.N.Y. 2014) (holding Bitcoin transactions could form the basis of a money laundering crime).

The defendants' motion ignores all of these cases, instead citing only *United States v. Petix*, No. 15-CR-227A, 2016 WL 7017919 (W.D.N.Y. Dec. 1, 2016).  But that case is the lone dissenting voice on this issue, and it is a magistrate judge's report and recommendation that was never adopted by the district judge and was mooted by subsequent developments in the case (including a guilty plea to the § 1960 charge).  Some courts have expressly rejected *Petix*'s reasoning.  *See Harmon*, 474 F. Supp. 3d at 90; *Stetkiw*, 2019 WL 417404, at *1–2; *Mansy*, 2017 WL 9672554, at *2.

The defendants tacitly acknowledge this regulatory scheme, as recognized by the courts, by asserting that ordinary usage supersedes any express definitions.  (PageID.113.)  But that is not the law.  Ordinary meaning is the default method of statutory interpretation only where the statute or regulation does not itself define the term.  *See, e.g.*, *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Assoc.*, 141 S. Ct. 2172, 2176 (2021) ("Where Congress does not furnish a definition of its own, we generally seek to afford a statutory term its ordinary or natural

meaning." (internal quotation marks omitted)); *Lopez v. Gonzales*, 549 U.S. 47, 53 (2006) (observing that where "the statutes in play do not define the term," courts "remit . . . to regular usage"); *United States v. Fitzgerald*, 906 F.3d 437, 442 (6th Cir. 2018) (observing that a term is given its natural meaning "if left undefined in the statute"); *In re Anheuser-Busch Beer Labeling Marketing & Sales Practices Litig.*, 644 F. App'x 515, 520 (6th Cir. 2016) ("The regulations do not define the word . . . , and '[i]n the absence of such a definition, [courts] construe a statutory term in accordance with its ordinary or natural meaning.'" (alterations in original) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994))).

Even if Congress and the Treasury Department were not free to define terms, the defendants' plain usage arguments are suspect.  First, they acknowledge that some definitions of "money" are quite broad.  (PageID.114.)  They also contend that money must be "a medium of exchange," "a unit of account," and "a store of value."  (PageID.116.)  Crediting this definition for the sake of argument, the defendants cannot prevail on their motion to dismiss because there is at the very least a factual dispute over whether Bitcoin is all three.  *See Fitzgerald*, 906 F.3d at 445 (affirming jury instruction defining statutorily undefined term); *United States v. Lechner*, 806 F.3d 869, 880–82 (6th Cir. 2015) (affirming jury instructions in a case involving a regulatory offense).

The defendants say Bitcoin is not a "medium of exchange" because it can only be used to "purchase various goods and services," not all of them.  (PageID.116.)  Publicly available information demonstrates that for the last several years, Bitcoin could be used to purchase a wide assortment of goods and services.  *See, e.g.*, Jacob Bernstein, *What Can You Actually Buy With Bitcoin?*, N.Y. Times, Feb. 3, 2021, *available at* https://www.nytimes.com/2021/02/03/style/what-can-you-actually-buy-with-bitcoin.html

(observing that as early as 2014, Bitcoin could be used to buy items on Overstock.com, and more recently, Bitcoin could be used to purchase items from Microsoft, AT&T, Home Depot, and apps available in the Apple and Android stores permitted "crypto-connoisseurs to pay for airline tickets by converting Bitcoin to fiat money in real time").  Notably, El Salvador recently announced that Bitcoin will be legal tender later this year, indicative of its maturation as a medium of exchange over the last several years.  Reuters, *Bitcoin to become legal tender in El Salvador on Sept 7* (June 24, 2021), https://www.reuters.com/technology/bitcoin-become-legal-tender-el-salvador-sept-7-2021-06-25/ (last visited Aug. 11, 2021).

The defendants next argue Bitcoin is not a unit of account based on a 2014 publication—three years before the defendants began their illegal business—supposedly because it cannot serve as a medium of exchange between people and allow coordination across society. (PageID.116.)  But quite to the contrary, many people, including the defendants, are attracted to cryptocurrency because it provides for seamless "coordination across society" by allowing people to move value anywhere in the world instantaneously and outside of the traditional banking system.  More to the point, in markets where goods and services are sold in Bitcoin, prices can be listed in Bitcoin, and wallet providers list account balances in Bitcoin.

Finally, the defendants argue, based on 2013 and 2014 valuations, that Bitcoin is not a "true store of value."  (PageID.117.)  This ignores that at the beginning of the conspiracy, Bitcoin's market capitalization was approximately $20 billion, surpassed $300 billion during the conspiracy, and has since topped $1 trillion.  https://www.blockchain.com/charts/market-cap (last visited Aug. 11, 2021).  Under some circumstances, people may prefer to store value in cryptocurrency over fiat currency.  "In this digitally connected world, Venezuelans have flocked to cryptocurrencies as a store of value, seeking refuge from inflation."  Nasdaq, *Why Does This*

*Country Have the Third Highest Cryptocurrency Usage?* (May 20, 2021),

https://www.nasdaq.com/articles/why-does-this-country-have-the-third-highest-cryptocurrency-

usage-2021-05-20 (last visited Aug. 11, 2021).  Major U.S. financial markets and institutions

track and report on cryptocurrency prices and offer cryptocurrency indices.  *See, e.g.*, Nasdaq,

Cryptocurrency, https://www.nasdaq.com/market-activity/cryptocurrency (last visited Aug. 11,

2021); Fidelity, GBTC,

https://eresearch.fidelity.com/eresearch/evaluate/snapshot.jhtml?symbols=GBTC (last visited

Aug. 11, 2021) (fund "formed on September 25, 2013" that "invests in Bitcoins" and "seeks to

track the performance of the TradeBlock XBX Index").

Consequently, even under the defendants' preferred definition, Bitcoin is money.  *See*

*Harmon*, 474 F. Supp. 3d at 89 ("Bitcoin is just that – a medium of exchange, method of

payment, and store of value."); *id.* at 90 (rejecting the defendant's argument that the ordinary

definition of money controls, even where the defendant argued that that definition encompasses

Bitcoin); *Murgio*, 209 F. Supp. 3d at 707 (finding Bitcoin to be "funds" subject to § 1960 under

the ordinary meaning of the word).

### B.  Exchangers Are Transmitters for Purposes of 18 U.S.C. § 1960.

In addition, exchangers are "transmitting" under the statute.  "'[M]oney transmitting'

includes transferring funds on behalf of the public by any and all means . . . ."  18 U.S.C.

§ 1960(b)(2); *see* 31 U.S.C. § 5330(d) (2017) (money transmitting can include transferring).

Under 31 C.F.R. § 1010.100(ff)(5)(i), transmission is defined in part as "the acceptance of

currency, funds, or other value that substitutes for currency from one person and the transmission

of currency, funds, or other value that substitutes for currency to another location or person by

any means."  The operative phrase is transmission "to another location or person."  As noted

above, these definitions are generally broadly construed in light of the broad language employed, including "by any means."

As the *Harmon* court and FinCEN, among others, have recognized, bitcoin is held at an "address" on the blockchain, somewhat akin to an account, and exchangers like the defendants send the bitcoin to a different address as part of a particular transaction. 474 F. Supp. 3d at 103–09 ("FinCEN's analysis implicitly rejects defendant's position that the Bitcoin blockchain is a single location such that transfer between addresses on the blockchain is not transmission between locations. FinCEN's position is persuasive."). Therefore, the transfer from one address to another constitutes transmission "to another location." And where a different person controls the receiving address, the same transaction can be said to transfer the bitcoin "to another . . . person." Some of the cases cited above have either held or acknowledged as much. *See Harmon*, 474 F. Supp. 3d at 103 ("[C]ourts in other criminal cases have held that § 1960(b)(1)(B) reaches unlicensed operations reaping a commission from exchanging traditional for digital currency."); *id.* at 104 (rejecting argument that exchanging was not transmission because moving bitcoin between addresses amounted to "transmission between locations" and sending bitcoin to another person was "transmission between parties"); *Stetkiw*, 2019 WL 417404, at *1 (conduct involved "a Bitcoin exchange service"); *Murgio*, 209 F. Supp. 3d at 704 ("The allegations in the Indictment stem from Murgio's alleged operation . . . of Coin.mx, a website that the Government characterizes as an unlawful Bitcoin exchange . . . ." (footnote omitted)); *Budovsky*, 2015 WL 5602853, at *1 (describing conduct as the operation of a website that acted as an exchange).

Department of Treasury guidance explains why this is so. "[A] person is an exchanger and a money transmitter if the person accepts such de-centralized convertible virtual currency

from one person and transmits it to another person as part of the acceptance and transfer of currency, funds, or other value that substitutes for currency."  2013 FinCEN Guidance, at 5; *accord* Dep't of the Treasury FinCEN Guidance, *Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies*, FIN-2019-G001, at 13–14 (May 9, 2019) (hereinafter "2019 FinCEN Guidance"), *available at* https://www.fincen.gov/sites/default/files/2019-05/FinCEN%20Guidance%20CVC%20FINAL%20508.pdf (stating that "[t]he 2013 VC Guidance also clarified that FinCEN interprets the term 'another location' broadly" to include "transmission from [a] person's account at one location (e.g., a user's real currency account at a bank) to the person's CVC account with the exchanger").[7]

Of course, the retail, "hand-to-hand" exchange is not the only conduct that exchangers, including the defendants, undertake.  Exchangers need to move both bitcoin and cash to and from the retail exchange.  Here, for example, in a typical deal, DeJager purchased bitcoin from a licensed exchange (like Coinbase) and sent it to Boden, who then would sell it to the customer (personally, or through a staff member, like Swink).  Therefore, the bitcoin was transmitted from the lawful exchange to DeJager to Boden and ultimately to the customer.  The cash went in the opposite direction.  Each of these steps involved a different location (Bitcoin address) and

---

[7] This guidance also explains why mixers or tumblers—defined as "[p]roviders of anonymizing services" and "persons that accept [convertible virtual currencies] and retransmit them in a manner designed to prevent others from tracing the transmission back to its source"— are money transmitters.  2019 FinCEN Guidance, at 19–20.  As noted above, Boden and DeJager both provided and used anonymizing services.  Although the 2019 FinCEN Guidance post-dates the offense conduct here, it expressly did "not establish any new regulatory expectations or requirements.  Rather, it consolidate[d] current FinCEN regulations, and related administrative rulings and guidance issued since 2011, and then applie[d] these rules and interpretations to other common business models involving CVC engaging in the same underlying patterns of activity." *Id.* at 1.

person.  Consequently, even were the Court to conclude the retail exchange alone insufficient to constitute transmission, the defendants still transmitted bitcoin within the meaning of the statute by bringing it from the source to the retail transaction, and ultimately the customer, and by sending the cash the other way.

As with money, the defendants are incorrect that the ordinary usage of transmission trumps the legal definitions, as explained above.  And also as with money, even if they were correct, their reading of the ordinary usage is wrong.  They agree with the statutory definition that transmission means movement between people or places.  But they overlook both that a "two-party transaction" involves such movement, and even if it did not, the defendants moved bitcoin and cash between several people and places to facilitate that transaction.  At a minimum, a jury could find that the defendants transmitted money.

If the text of the statutory and regulatory scheme and guidance were not enough, the 2019 FinCEN Guidance describes why the defendants' conduct is exactly that which Congress and the Treasury Department intended to regulate under the BSA.

> The BSA regulatory framework begins with the expectation that financial institutions will operate under a culture of compliance supported by senior leadership, including owners, boards of directors, and senior executives. This culture of compliance will dictate the basic norms of behavior, knowledge, and transparency under which the management team, employees, and service providers will be held accountable.
>
> The BSA and its implementing regulations require MSBs to develop, implement, and maintain an effective written anti-money laundering program ("AML program") that is reasonably designed to prevent the MSB from being used to facilitate money laundering . . . .

2019 FinCEN Guidance, at 9–10 (footnote omitted).

The defendants, under Boden's leadership, flouted this regulatory scheme, as summarized above and as the government intends to prove at trial.  Far from "operat[ing] under a culture of

compliance" with "an effective written anti-money-laundering program," Boden and his co-defendants operated an illicit financial institution and held the business out to be a money laundering operation.  This is precisely the kind of conduct the BSA prohibits.

## IV.   CONCLUSION

The Court should deny the motion.

Respectfully submitted,

ANDREW BYERLY BIRGE
United States Attorney

Dated: August 12, 2021

/s/ Justin M. Presant
JUSTIN M. PRESANT
Assistant United States Attorney
P.O. Box 208
Grand Rapids, MI 49501
(616) 456-2404
justin.presant@usdoj.gov

**CERTIFICATE IN ACCORDANCE WITH**
**LOCAL CRIMINAL RULE 47.1(b)(ii) AND ADMIN. ORDER 18-RL-85**

        In accordance with L. Crim. R. 47.1(b)(ii) and Administrative Order No. 18-RL-85, the undersigned certifies that this brief complies with the type-volume limitation and contains no more than 10,800 words as provided by Rule 47.1(b)(i).  A word count was made using Microsoft 365 and the brief contains 6,928 words.

        Respectfully submitted,

        ANDREW BYERLY BIRGE
        United States Attorney

Dated:  August 12, 2021        /s/ Justin M. Presant
        JUSTIN M. PRESANT
        Assistant United States Attorney
        P.O. Box 208
        Grand Rapids, Michigan 49501-0208
        (616) 456-2404
        justin.presant@usdoj.gov