UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:21-cr-40 |
| Plaintiff, | Hon. Robert J. Jonker |
| v. | Chief United States District Judge |
| CHRISTOPHER ALLAN BODEN, | |
| Defendant. | |
| _____/ | |

# DEFENDANT CHRISTOPHER A. BODEN'S SENTENCING MEMORANDUM

The sentencing hearing for Defendant Christopher Allan Boden is scheduled for February 25, 2022, at 3:00 p.m. Previously, on October 18, 2021, Mr. Boden appeared before this Court, accepted responsibility for his actions, and entered a guilty plea to Counts 2, 16, and 21 of the Indictment, charging him with operating an unlicensed money transmitting business, money laundering, and structuring, respectively. The Court accepted Mr. Boden's guilty plea and adjudicated him guilty.

## SENTENCING CONSIDERATIONS

18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Mr. Boden respectfully requests that this Court exercise its discretion to consider all of the factors set forth in 18 U.S.C. § 3553(a) to the extent applicable, "recognizing that imprisonment is not an appropriate means of promoting correction or rehabilitation," and not just

1

the Guidelines.  *See* 18 U.S.C. §§ 3553(a), 3582(a); *United States v. Maddalena*, 893 F.2d 815, 818 (6th Cir. 1989) (remanding for the District Court to consider the defendant's mitigating circumstances, in light of the District Court's discretion to deviate from the Guidelines).  Those factors illustrate that 37 months, as recommended by the U.S. Probation Office—while a significant downward variance from the advisory guidelines—is still far greater than necessary to achieve the purposes of sentencing.

## I.     The nature and circumstances of the defendant and the context of the offenses of conviction suggest a term of probation is appropriate

As illustrated in Mr. Boden's Brief in Support of his Motion for Variance, (ECF No. 81), it is no stretch to call Mr. Boden a pillar of his community, and he has worked hard his entire adult life to expand access to science and technological education.  That education was not limited to the typical classroom subjects, and extended to things like cryptocurrency—Bitcoin, for example.  Mr. Boden taught classes at The Geek Group that taught people how Bitcoin and the technology underlying it works, how to buy and sell Bitcoin on their own, and, as part of the course fee, provided participants with Bitcoin to begin their own journey as owners of cryptocurrency.  Mr. Boden's goal, as he explained to the Probation Office, was "simply to get Bitcoin into the hands of as many people as possible.  It was to Educate and Inspire as many people as we could with the incredible potential all this new technology has to offer the world."

Mr. Boden eventually tried to make good on those goals by offering bitcoin for sale at The Geek Group itself.  But those sales were almost entirely handled by himself and his co-defendants; The Geek Group as a whole was no criminal enterprise, and the vast majority of its volunteers had nothing to do with the sale of Bitcoin.

Nevertheless, Mr. Boden does not treat his commission of this offense lightly. Nor does he minimize his own role in the offense. At the same time, however, the circumstances of this offense, when placed in the proper context, illustrate that a term of incarceration of 37 months is far greater than necessary to achieve the purposes of sentencing. At their core, Mr. Boden's acts centered around the sale of Bitcoin for cash. The profits from those sales—when there were profits—did not go to enrich Mr. Boden or his co-Defendants. Instead, the proceeds went toward keeping the lights on, the heat on, and the mortgage paid at The Geek Group, which in turn provided technical and scientific education to a wide array of people in Grand Rapids and beyond.

Mr. Boden recognizes that his conduct broke the law. But the Government's prosecution of these acts is far removed from the concerns that 18 U.S.C. § 1960 was designed to combat, and which might give rise to the offense's five-year maximum term of imprisonment. *See* 18 U.S.C. § 1960(a). Defendants addressed this at length in their Motion to Dismiss the Indictment and will not rehash it here. (*See* ECF No. 37, PageID.122–123.) However, it warrants repeating that Mr. Boden's customers were "walk ins"—arms-length transactions which, though admittedly not compliant with regulatory requirements, are a far cry from financing overseas terrorism as the statute was designed to prevent in the wake of the September 11th attacks. (*See id.*) Mr. Boden does not make light of his acts, but those acts are not the poster child for violations of section 1960. Mr. Boden's sentence should reflect that reality.

The Government insists on a more developed conspiracy, and points to several messages among the Defendants to suggest they were well aware that their acts violated the law. For example, the Government notes that that Mr. Boden and his co-defendants "mixed" or "tumbled" Bitcoin, and insists that this was done "to thwart anti-money-laundering controls." (*See* ECF No.

85, PageID.671–672.)  Again, context is key.  Mr. Boden initially participated in mixing bitcoin.  However, as he explained in his submission to the Probation Office, he learned that Coinbase—the cryptocurrency exchange used to purchase Bitcoin—"was tracing the coins it sold for five or more hops downstream."  (ECF No. 89, PageID.875–876.)  While know-your-customer regulations require just that—knowing one's own customers—Boden understood that Coinbase went *much farther*.  He believed Coinbase would suspend or terminate the account used to purchase BTC not only if one of his customers used the funds for illegal activity, but if one of his customer's customer's customer's customers did so.  Avoiding such an outcome hardly amounts to a scheme to thwart money laundering regulations, which do not (and indeed feasibly could not) require such extensive downstream tracking of transactions.  Again, Mr. Boden's sentence should reflect the fact that he and his co-defendants did not "mix" or "tumble" bitcoin in order to evade government detection, but simply to avoid running afoul of their broker's practices.  That "mixing" was not integral to the Defendants' sales of bitcoin is made clear by the fact that they abandoned the process because it was too costly and cumbersome.

The Government also points to several conversations between the Defendants to suggest that the Defendants were aware of structuring laws and were not acting on the advice of others in structuring their banking deposits.  (ECF No. 85, PageID.673–674.)  Certain of these examples are stripped of critical context.

In the most jarring example, the Government alters a quote by omission to suggest Mr. Boden is reacting to something he is not.  The Government presents Mr. Boden's all-caps, expletive-laden message as a reaction to news that a bank employee inquired about large cash deposits being made to his account.  (ECF No. 85, PageID.673.)  In fact, Mr. Boden's apparently panicked reaction is more in line with the character so many have written to attest to.  The Geek

4

Group had installed and maintained at its own expense a tornado siren to help alert the westside community in a potential emergency.  Mr. Boden had realized that he failed to test it on the first Friday of the month at noon, when the conversation was taking place.  The ellipses in the Government's brief do a lot of work, and the full context illustrates that the defendants *did not believe* they were committing a crime.  The Government's omissions are in bold:

VC 15:59:45: just got a call from [S.H.] at PNC

**Boden 15:59:52: YAY [S.] :)**

**Boden 15:59:58: What's up?**

**Boden 16:00:08: We like [S.], he's cool**

VC 16:00:08: he wants to know about the massive cash deposits going into your account

**Boden: 16:00:16: That was you ;)**

VD 16:00:21: money laundering, is what I told him

**Boden: 16:00:28: Good, he's okay with that**

VC 16:00:32: lol

**Boden: 16:00:36: GOD DAMN IT!**

VC 16:00:39: I actually told him noting [sic]

Boden 16:00:40: FUCK FUCK FUCK FUCK FUCK

VC 16:00:42 nothing

**Boden 16:00:46 It's NOON!**

**Boden 16:00:53: It's Friday the 1st**

**VC16:00:54: Exactly noon**

**Boden 16:01:01: and I'm not running my TORNADO SIREN**

**Campbell 16:01:04: friday the 4th.**

5

**16:01:13: FFFFFFFFFFFFFFFFUUUUUUUUUUUUUCCCCCCKKKKKKKK**

16:01:13: I forgot about it.

(*See* ECF No. 85-1, PageID.711–712.) As the Government's memorandum notes, Boden's partner in the conversation explains that "there was a big money laundering arrests [sic] around e-currency worldwide," to which Boden responded "ok, but we're not laundering money, lol" and "I sell bitcoin." (*Id.* at PageID.713.) Yet again, context matters. And the context here illustrates that Boden's messages are not a panicked reaction to a bank employee's request for information about cash deposits. The messages were plainly about his failure to test his tornado siren at the correct time, and the follow up messages illustrate his belief that he was simply selling bitcoin.

Finally, the nature and circumstances surrounding Count 28 of the Indictment, which the Government charged but Mr. Boden did not plead guilty to, warrant discussion. The Government selects several quotations from Mr. Boden's discussions with the Government's undercover officer, whom the Government sent to The Geek Group to pose as a cocaine dealer purchasing bitcoin. Mr. Boden does not deny any of the statements the Government notes. Again, however, the context of how Mr. Boden found himself in the situation in which he made those statements matters.

Mr. Boden gave another man a series of personal loans, memorialized by promissory notes because, once again, Mr. Boden wanted to help the man. When generating those loans, the borrower provided Mr. Boden with information to help collections efforts if needed. When Mr. Boden came to realize that he would not be repaid, he first called the FBI. Later, Mr. Boden took the information he had compiled to a law firm. The law firm offered to collect the debt in exchange for a fee of 20% of the debt collected. Unfortunately, despite giving the firm the

6

information in his possession, the firm was unable to recover any of the funds Mr. Boden had loaned out. Mr. Boden thought the money was gone for good. The losses heaped additional stress on Mr. Boden, who by then was struggling to keep The Geek Group afloat.

As he explained in his statement to the Probation Office:

> I could have told the undercover agent to go pound sand the moment he mentioned his career. I felt the hairs on my neck bristle with fear of 'this is not your world and you do not belong here' when he introduced himself, but I had to balance the bigger picture. That same morning, Moose had been in tears in my office, overwhelmed with stress about the shutoff notice and mortgage payment.

[ECF No. 89, PageID.885.]

Mr. Boden does not believe this absolves him from his actions, and he does not expect—let alone ask—the Court to ignore Count 28 of the Indictment. But the Court should be aware of the complete circumstances that led to the acts charged in count 28. The Government dismisses Mr. Boden's above-quoted explanation, but Boden's discussions with the Government's undercover agent are laden with demonstrable puffery (to put it charitably) that corroborates him hoping to appear like he was not entirely out of his depth.

During the October bitcoin purchase, for example, the undercover agent asked Mr. Boden if he preferred large or small bills for the purchase of bitcoin. Boden explained: "No, it, it doesn't matter. Hundreds are great. Hundreds are easy to count." "It's when, it's when guys come in here and they want $25,000 and they show up with 20s and I'm like, oh, fuck you, man." (Ex. 1, at 26:7–15.) Mr. Boden hoped to project that he belonged in the same room as the undercover agent. Despite presenting this as a frequent inconvenience, no cash transaction Mr. Boden conducted approached anywhere near the $25,000 he boasted about. Another time, Mr. Boden explained to the undercover agent that he had "like eight different guys I can buy

7

[Bitcoin] from," another fabrication to make him appear more connected—and more at ease—though he fundamentally was out of his element. (*Id.* at 17:8–12.)

## II. Respect for the rule of law and adequate deterrence are ensured

The Government paints Mr. Boden as a man bent on escaping responsibility for his actions and evading the rule of law. Not so. Mr. Boden accepts responsibility for his acts. He stood before the Court at length on October 18, 2021, at his change-of-plea hearing and the Court is in the best position to determine whether Mr. Boden has accepted responsibility and respects the rule of law. Nevertheless, a few points warrant discussion.

Incarceration is not necessary to promote respect for the rule of law in this case. The Government presents Mr. Boden as a man who treats his prosecution as a joke, and highlights that Mr. Boden "believed that if we were doing anything bad, . . . the worst that could happen is that a couple of guys would . . . tell us to stop doing that. . . . [T]hat's how the Government is supposed to work." (ECF No. 85, PageID.677.)

Mr. Boden's expectation about how the Government would approach this issue is not borne of entitlement, but lived experience. The process he describes is in fact how other federal agents worked with him on prior instances of regulatory violations. In 2014, a member of The Geek Group purchased handheld radios for The Geek Group's employees and volunteers to use while in the building. This was important because of the size of The Geek Group's building. Mr. Boden showed the radios on one of The Geek Group's YouTube videos and praised their utility and low cost. A few months later, an agent from the FCC visited The Geek Group. The agent enquired about the radios and explained the Chinese-made radios were not properly authorized by the FCC to be used in the United States, and could interfere with critical radio

8

frequencies. Then he answered questions from Mr. Boden and his team, and gave them a tour of their truck. The Geek Group got new (compliant) radios and the problem was resolved.

That experience colored Mr. Boden's perceptions of regulatory issues like licensure for money transmitting businesses. And that experience, rather than a non-acceptance of responsibility, is what colors Mr. Boden's statements to the U.S. Probation Office.

### III.   37 months' imprisonment is greater than necessary to achieve deterrence in this case

The PSR's recommended term of imprisonment, while a significant downward variance from the advisory guidelines, is still far greater than necessary to achieve deterrence in this case. Mr. Boden's and The Geek Group's downfall were uniquely public. Mr. Boden did not only lose everything he worked for; he *publicly* lost everything he worked for. Mr. Boden's indictment for selling bitcoin and The Geek Group's dissolution as a result of those actions was well covered in both local and national news media. *See, e.g.*, Bianca Cseke, *Former members of The Geek Group indicted in connection to illegal Bitcoin trading*, Fox 17 (Mar. 2, 2021), https://tinyurl.com/mtxczrje; Kelly Cromley, *Geek Group Shuts Down after Federal Authorities Raid Office for Crypto Trading*, Cointrust (Jan. 7, 2019), https://tinyurl.com/mu6an34z.

And Mr. Boden himself has publicly accepted responsibility for his actions and his role in the offense. Indeed, shortly after the Government executed its search warrant, he spoke candidly in a YouTube live show to explain that his errors were his responsibility, and that he was going to pay for those errors. This public acceptance of not only responsibility but consequences helps to ensure that others are deterred from engaging in similar behavior in the future.

### IV.   Protecting the public from further crimes

Mr. Boden is already deterred from engaging in this type of behavior in the future. Specific deterrence is already achieved: After the Government executed the search warrant on

The Geek Group, the organization, which Mr. Boden had worked his entire adult life to build, collapsed overnight.  Moreover, the Government has already obtained a money judgment of $700,000 from Mr. Boden.  As the money generated through the sale of bitcoin was used to fund The Geek Group's operations—rather than enrich Mr. Boden or his co-defendants—this amounts to $700,000 out of Mr. Boden's pocket.  In short, Mr. Boden has lost everything he worked for.  Specific deterrence is already achieved.

## V.     The Black Book

In Mr. DeJagaer's letter to the Court attached to his Sentencing Memorandum (ECF No. 91), he describes his reaction during a proffer when the government showed him images from a "black book," the existence of which and contents therein appeared to surprise Mr. DeJagaer—presumably because the anonymity with which The Geek Group promised to the purchasers of bitcoin.  The minimum 12-word phrases contained therein, are a type of passcode associated with a corresponding bitcoin wallet or Trezor.  While it is unclear know how this seized evidence was presented to Mr. DeJager, there is nothing nefarious about its existence or the contents therein.  A vast majority of the phrased passcodes correspond to Mr. Boden's accounts, others are from friends and some mostly elderly clients who specifically asked Mr. Boden to keep the passcodes as a backup in the event the owner of the bitcoin account lost the copy they retained.  Again, to help those who requested it, Mr. Boden kept (and kept safe until the raid) this backup copy of the phrased passcode at the request of friends and mostly elderly clients who trusted (and continue to trust) Mr. Boden.  Again, context, while not everything, is important when the Court contemplates the sentencing factors and imposes sentence.

## CONCLUSION

In light of the entire circumstances of this case, Mr. Boden respectfully submits that a 37-month term of incarceration is more than necessary to achieve the purposes of sentencing. Mr. Boden respectfully requests that the Court consider a term of probation.

Respectfully Submitted,

WARNER NORCROSS + JUDD LLP

Dated: February 18, 2022

By _____
Brian P. Lennon (P 47361)
Paul H. Beach (P82036)
Warner Norcross + Judd LLP
150 Ottawa Avenue, NW, Suite 1500
Grand Rapids, MI 49503
(616) 752-2000
blennon@wnj.com
pbeach@wnj.com

*Attorneys for Defendant Christopher Boden*

189725.189725 #23608520-7