```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE WESTERN DISTRICT OF MICHIGAN

 3                             SOUTHERN DIVISION

 4       UNITED STATES OF AMERICA,

 5            Plaintiff,                    No.  1:21cr40

 6         vs.

 7       CHRISTOPHER ALLAN BODEN,

 8            Defendant.

 9

10       Before:

11                         THE HONORABLE ROBERT J. JONKER,
                               U.S. District Judge
                               Grand Rapids, Michigan
12                           Friday, February 25, 2022
                               Sentencing Proceedings
13
         APPEARANCES:
14
                         MR. ANDREW BIRGE, U.S. ATTORNEY
15                       By:  MR. JUSTIN MATTHEW PRESANT
                         330 Ionia Avenue, NW
16                       P.O. Box 208
                         Grand Rapids, MI 49501-0208
17                       (616) 808-2184

18                              On behalf of the Plaintiff;

19                       MR. BRIAN P. LENNON
                         MR. PAUL HARZEN BEACH
20                       Warner Norcross & Judd LLP
                         1500 Warner Building
21                       150 Ottawa Avenue NW
                         Grand Rapids, MI 49503
22                       (616) 752-2089

23                              On behalf of the Defendant.

24
         REPORTED BY:  MR. PAUL G. BRANDELL, CSR-4552, RPR, CRR
25
```

1    02/25/2022

2    (Proceedings, 3:02 p.m.)

3    THE CLERK:  The United States District Court for the

4    Western District of Michigan is now in session.  The Honorable

5    Robert J. Jonker, chief judge, presiding.

6    THE COURT:  All right.  We're here on the case of the

7    United States against Christopher Boden, 1:21cr40.  It is the

8    time set for sentencing, and let's start with appearances,

9    please.

10    MR. PRESANT:  Good afternoon, Your Honor.  Justin

11    Presant on behalf of the United States.

12    THE COURT:  Thank you.

13    MR. LENNON:  Good afternoon, Your Honor.  Brian Lennon

14    and Paul Beach, Warner, Norcross & Judd, and we are flanking

15    our client, Chris Boden.

16    THE COURT:  Thank you.  Welcome everyone.

17    Let me summarize what I have received from the parties

18    and make sure I have everything in hand that the parties wanted

19    me to have.  I do have the presentence report from our

20    probation officer, Ms. Gonzalez.  I have a sentencing

21    memorandum and a motion for downward variance from the Defense,

22    so both of those on behalf of Mr. Boden, which include a number

23    of letters, a lot of letters actually, a separate motion for

24    variance that really introduces the brief from the Defense, and

25    then a government motion on a number of issues as well.  There

1    are two forfeiture orders.  One I think has already been

2    entered with respect to all the Defendants for some in kind

3    forfeiture of cryptocurrency, but then the proposed money

4    judgment in this case as well.  I think that's it.  Anything

5    else I should have from the government in written form,

6    Mr. Presant?

7            MR. PRESANT:  No, Your Honor.  The Court has all our

8    materials.  Thank you.

9            THE COURT:  Mr. Lennon?

10           MR. LENNON:  No, Your Honor.  Thank you.

11           THE COURT:  Okay.  Thank you.  The case came in under

12   a plea agreement.  It did call for dismissal of a number of the

13   charges in exchange for Mr. Boden's plea to several of them.

14   Three in particular.  I do think that under 6B1.2 of the

15   guidelines and related authority that that's a fair resolution

16   of the case that honors the purposes of sentencing and I am

17   accepting the plea agreement and would invite the government's

18   motion to dismiss the affected charges?

19           MR. PRESANT:  Yes, Your Honor.  The government now

20   moves to dismiss Counts 1, 3 through 15, 17, 19, 20 and 22

21   through 28.

22           THE COURT:  All right.  So I'll go ahead and grant the

23   government's motion on that, leaving us with the three

24   convictions, Count 2, Count 16 and Count 21.  And the guideline

25   determinations on those counts combined, I think there are some

1    disputes or at least one on the guidelines, but then regardless
2    of where we wind up on the guidelines, there is certainly a
3    difference of opinion between the parties on where the Court
4    ought to end up as a final matter.  Let's go through the
5    guidelines.
6           So we have 22 points to start.  That's the base level.
7    Eight plus fourteen for the amount of loss.  Six were tied to
8    knowledge of drug proceeds being involved in some of the
9    transactions.  Four points added to account for the business of
10   money laundering, and then two points added for sophisticated
11   means.  I am not sure that's the exact way that the guideline
12   characterizes that two points, so I am looking for it, but in
13   any case we get to 34 when you add all that up.
14          There is a four-point role enhancement that the
15   probation officer has recommended that the Defense disputes,
16   but under the PSR that takes us to 38.  Probation officer
17   recommends acceptance, and I don't think the government is
18   objecting to it, though its brief at times made me wonder.
19   Does the government object to acceptance or not?
20          MR. PRESANT:  Not as a guideline matter, Your Honor.
21   Those are 3553(a) arguments.
22          THE COURT:  Okay.  And then -- I understand that, and
23   we'll hear from the parties on that I'm sure, but as a
24   guideline matter then two points would come off for acceptance.
25   I would grant those two myself.  And is the government moving

for the third?

MR. PRESANT:  Yes.  The government so moves.

THE COURT:  So I'll grant that.  So under the PSR and that scoring we'd be at a level of offense 35.  Criminal history is category I, and the resulting guideline on the chart would be 168 to 210 months at that level.  Is the government satisfied with those guidelines?

MR. PRESANT:  The government agrees with the scoring, Your Honor.  Yes.

THE COURT:  Okay.  And Mr. Lennon, other than the role objection, do you have other guideline objections?

MR. LENNON:  We don't, Your Honor.  For clarification, I think the sophisticated means was tied to the tumbling and mixing.  So the guidelines are --

THE COURT:  Sophisticated laundering, right.

MR. LENNON:  Yes, sir.  The guidelines are technically correct, Your Honor.

THE COURT:  Okay.  Very good.  Well, why don't we do this.  I know that the Defense position is, notwithstanding those guidelines, the Court ought to vary downward to a non-custodial sentence.  The government does not agree with that.  In the course of articulating each side's position, you inevitably are going to talk about role.  So let me hear the Defense presentation as a whole, Mr. Lennon.  Everything on guidelines, variance, 3553 allocution and the like, and then

1    we'll give the government the same opportunity, and we'll give

2    Mr. Boden a chance to speak in between.

3              MR. LENNON:  Thank you, Your Honor.

4              And Your Honor, thank you for -- it was -- considering

5    both pleadings that we had filed, we filed that motion for a

6    variance with admittedly a lot more letters than I've ever

7    submitted, but frankly --

8              THE COURT:  It's probably more than I ever read for a

9    single sentencing, too.

10              MR. LENNON:  Well, and I have heard some judges say no

11    more than 10, so we took a risk, and that's why we wanted to

12    give it to the Court as early as possible.  Also, just with the

13    volume of material and some of these people who wrote letters,

14    Your Honor, are here today some as far as Texas and Kentucky to

15    support Chris.

16              But I also appreciate the opportunity to address the

17    Court at the -- as being the last -- representing the last

18    Defendant of the Co-Defendants.  And I'll get to leadership,

19    you know, very quickly and very succinctly, Your Honor, the one

20    outstanding scoring objection.  But there's never been any

21    question that Christopher Boden was the leader and organizer of

22    everything, of all these people that were back here, of all the

23    members there.  That's just who he is.  That's his personality

24    in all the community service initiatives.

25              So it was never a matter -- and I'll address it now.

1    It's never a matter that he was a leader or organizer,

2    including of the conduct set forth in the indictment. It's

3    just a question, frankly, Your Honor, whether it involved five

4    or more people. We believe that it involved four, the four who

5    were named Defendants, both Mr. Swink earlier, and the three

6    Defendants in this case.

7         So our point on the leadership objection is not to

8    dispute that he was a leader/organizer. It's just the number

9    of participants. And if the Court were to agree with that

10   argument we'd still be at guidelines of 31/I, which is 135 to

11   168, which we believe and respectfully submit far overstates

12   the nature and circumstances of the offense and is so great --

13   greater than necessary to achieve the purposes of sentencing.

14        So that's our argument. It didn't involve five or

15   more people, and that was what I believe Officer Gonzalez had

16   in the initial report. It was changed after the objection

17   meeting. We believe she was right with her recommendation

18   initially and respectfully ask that that be reduced to two.

19        So the other advantage of being last is I was able to

20   attend the sentencings earlier this week of Ms. Vogt,

21   Mr. Boden's wife, and Mr. Dejager, and where Christopher Boden

22   was discussed at some great length. So I am hoping to use

23   today's kind of walk through the factors here of 3553(a) to

24   address not only the arguments we have prepared but also some

25   of the Court's concerns and some of the new and renewed

1    arguments that were made by the prosecution, and particularly

2    when we look at the nature and circumstances of the offense.

3          The specific offense characteristics in paragraph 67,

4    68, 69, which totals 12 points, we specifically ask the Court

5    to make a finding similar to what the Court made in

6    Mr. Dejager's case and Ms. Vogt's case is that it vastly

7    overstates the nature and circumstances of this offense.  So as

8    the Court did earlier this week we respectfully ask the Court

9    to do the same here.

10          If both of those things were done, Your Honor, we

11   would have a resulting guideline for effective purposes today

12   of level 21, criminal history category I, which comes to an

13   advisory range of 35 to 46 months, and I respectfully submit

14   that that is a more appropriate starting point from which the

15   Court can and must impose its duty of imposing a sentence that

16   is sufficient but not greater than necessary to comply with the

17   purposes of sentencing.

18          So in addressing some of the Court's concerns, some of

19   the new, or new suggestions by the government, if we turn first

20   to kind of the seriousness of the offense, and I think there

21   was a comment that, or at least an inference made in the

22   government's pleading that the seriousness was not recognized.

23   At no time has Mr. Boden or any of the Co-Defendants or their

24   lawyers ever said in a reply that these crimes are not serious.

25   As the Court explained, the Title 18 United States Code 1960,

1    which was broadened and strengthened post 911 through the

2    Patriot Act, is a tool to stop clandestine financing for

3    terrorist organizations.  And if that was going on here, Your

4    Honor, or the financing of some domestic or international drug

5    organization, then these guidelines would be absolutely

6    appropriate.  And I am talking about the higher ones.  That's

7    not the case here.  And pointing to what Mr. Boden and The Geek

8    Group were doing while violating the law was, you know, just

9    simply pointing out the difference between the intent of 18 USC

10   1980 and what Mr. Boden and the Co-Defendants were doing in

11   this case does not show a lack of seriousness from Defense.

12   It's just simply to distinguish the nature and circumstances of

13   this offense.

14        Going to the promotion and respect for the law.

15   Mr. Boden is not blaming law enforcement or the prosecution for

16   the demise of The Geek Group.  He never did.  Mr. Boden has

17   always had a good working relationship with law enforcement.

18   There were police officers counted among the members of The

19   Geek Group.  Police had asked and received The Geek Group's

20   surveillance videos when crimes in the surrounding area were

21   being investigated.

22        After Mr. Boden fired a volunteer who The Geek Group

23   allowed to live in the building after that volunteer was

24   sexually harassing several women, the police, Grand Rapids,

25   were called often on complaints.  Even the SWAT team showed up.

1    And among the materials Mr. Boden submitted to the probation

2    officer was a picture, a selfie that he took with the SWAT team

3    on one of these calls where they were falsely targeted, again,

4    we believe by this volunteer who was very publicly removed and

5    his friends.

6          And Mr. Boden doesn't blame and has never blamed the

7    federal agents who he spoke with for hours before he finally

8    called me to come to The Geek Group on the day of the raid on

9    December 18th.  He spoke to them at length.  He has never had

10   anything but respect for law enforcement, and he has never

11   blamed the government or law enforcement for this.  What he has

12   said is that after that raid and the public media coverage

13   afterwards, that led to the demise of The Geek Group.

14         Mr. Boden's comment that if we were doing something

15   wrong and the -- so I just want to let the Court know that that

16   was also very publicly done.  So I want to address that a

17   little bit more when I talk about the general deterrence that

18   the Court is interested in hearing about.

19         So the -- Mr. Boden has always understood, at least

20   now understands that the demise of The Geek Group was

21   inevitable, and when you hear from him today he is taking full

22   responsibility for that and not trying to blame anyone else,

23   specifically law enforcement.

24         There were a couple comments that Mr. Boden, or have

25   been associated with him I'd like to comment on.  And you know,

1    he would tell you -- he is the first one to acknowledge that

2    his mouth many times runs about five times faster than his

3    brain.

4         THE COURT:  Five seconds faster is what I think he

5    said in his submission to the probation officer.

6         MR. LENNON:  Seconds, minutes.  I think with my time

7    it probably is seconds more often than minutes, but the fact of

8    the matter is there are some things that he said that, you

9    know, he obviously would like and I'd like to give some context

10   to.  And one of those -- and again, these should not be

11   looking -- these should not be looked at, you know, in a

12   vacuum.  One of those comments, Your Honor, was when he said,

13   you know, I just thought when I did do something wrong the, you

14   know, law enforcement would come and tell us that we did

15   something wrong.  And that's just not just, you know,

16   breathtaking naivete.  That's actually experience of what had

17   happened at one point at The Geek Group.  I believe it was in

18   2018 when they obtained some radios so that they could

19   communicate with one another, 14, get some radios that they

20   could communicate with one another in this large building.

21   They were obtained by a member on-line and very inexpensively.

22         Well, they later learned why they were so inexpensive.

23   The frequency being used was too close to the frequency being

24   used by first responders, and in that case someone from the FCC

25   showed up at The Geek Group, explained the problem.  They

1    collected the radios, got rid of them, replaced them, and in

2    the meantime used the opportunity, Mr. Boden did, to tell this

3    person from the FCC about what was going on there.  Again, kind

4    of one nerd to another.

5         So the fact that he says that he -- and they have at

6    all times acknowledged -- you know, nobody is trying to say

7    they didn't know what they were doing wrong, but they thought

8    it was going to be handled a different way.  Not a crime but

9    something that needed to be addressed.

10        The other involved Mr. Boden's thought process and

11   decision making involving the undercover agent's request to buy

12   bitcoin to facilitate the undercover agent's purported cocaine

13   trafficking.  You know, in addition to the well-documented

14   desperation to keep the lights on and the programming going,

15   Mr. Boden has acknowledged that he wasn't getting any of the

16   cocaine.  At least this is how his thought process went on.  I

17   am not getting this cocaine.  We are not dealing with it.  He

18   wasn't getting any cut of the cocaine sales.  This was a world

19   that he was not familiar with, and he went into salesman mode.

20   In fact, the interaction has so many statements that are

21   objectively false because he is trying to make this sale and

22   get this money that it's just preposterous.  If there had been

23   any kind of due diligence on what was going on at The Geek

24   Group from the time of the raid until the time of the

25   indictment came down it would have been clear that these

1    statements are not true, objectively false.

2          So we get to, Your Honor, some of the other factors

3    here.  And again, I want to address some of the concerns that

4    were raised.  The last two factors of 3553(a), the need for

5    educational or vocational assistance or to protect the public

6    from future crimes of Mr. Boden.  I think they are clearly not

7    applicable.  From what the letters show, from what his history

8    is, from his, you know, great remorse that he has shown both

9    with the U.S. probation office and will today again with the

10   Court, there is certainly no reason that the sentence should

11   need to consider that Mr. Boden may be a future -- may be a

12   future danger to the community.

13         One of the questions or issues that was floated was

14   this marriage between Mr. Boden and Ms. Vogt and specifically

15   the timing thereof after the raid in December of 2018.  And I

16   think the inference that was trying to be made was the fact,

17   well, isn't that convenient as married couples they can't

18   testify against one another.  That was so far from the truth.

19         THE COURT:  I don't think anybody has ever suggested

20   that that was the motivation for marriage.

21         MR. LENNON:  Certainly was my takeaway was the

22   timing --

23         THE COURT:  I think sometimes what you take away may

24   be worse than what the government is inferring or what I am

25   even thinking, but I don't think there was any suggestion ever

1    from the government and certainly not from me that there was a

2    reason for them to marry other than they had been great friends

3    for 20 years and wanted to marry.

4            MR. LENNON:  And traumatic events like going to war or

5    someone's health problems, they often bring people to bind in

6    marriage.  So I won't address that any longer, Your Honor.  I

7    am glad the Court is not considering that.

8            There was also a reference in Mr. Dejager's letter

9    about the black book, this black book that he was shown during

10   a proffer.  There was a great explanation for that.  Those pass

11   codes that were in that book which were compiled not by

12   Mr. Boden, by one of his friends, who is -- who supplied

13   letters today, was to keep the passwords for Mr. Boden's

14   bitcoin.  He also, however, at the request of the person who

15   drafted or put the notations in there and some elderly clients

16   asked Mr. Boden to keep a copy of their passwords in case they

17   lost them.  They did it because they trusted him.  They knew he

18   wouldn't steal anything, and he didn't steal anything here.

19   Mr. Boden has stolen nothing.  There are no victims in this --

20   in these crimes.  So whether Mr. Dejager was just, you know,

21   surprised that -- of the existence of this book, I don't know,

22   but there is certainly nothing nefarious about it.

23           Now, the government did suggest yesterday or a --

24   yesterday I believe there was some kind of equivalence of the

25   purpose and intent of The Geek Group and their Defendants to

1    drug traffickers.  Sale of bitcoin generally at The Geek Group

2    and by Messrs. Boden and Dejager dealing with the uncover

3    specifically was to keep the heat on, utilities paid, and to

4    continue its community service activities.  A substantial part

5    of the undercover's buy money was not even recovered when the

6    agents raided the building because Mr. Boden had given that to

7    his wife to go pay bills.  This is very different than a drug

8    dealer who justifies pushing poison on the community to feed

9    one's family.

10            The laundering for other drug dealers in Count 28 are

11   also arguably a bit overstated.  Did some community members buy

12   small increments of bitcoin from The Geek Group to buy user

13   quantities of marijuana from others?  Sure.  Not a hand-to-hand

14   drug deal with Mr. Boden or anyone else or any of The Geek

15   Group volunteers at the front desk.  He never denied knowing

16   that some members of the community purchased small amounts of

17   bitcoin to obtain marijuana elsewhere.

18            There was a large yellow sign, Your Honor, outside the

19   building that said, you know, we sell bitcoin.  So this conduct

20   that is now being prosecuted and has been prosecuted in which

21   Mr. Boden takes full responsibility for was done in an open and

22   notorious manner, and I think that's important when looking at

23   all the factors, the history and characteristics as well as the

24   nature of the offense here.

25            THE COURT:  Well, just so I understand, there is no

doubt there was a sign.  There is no doubt there was a bitcoin

terminal, but to say the counter sales were open and notorious

in the same way, that's part of the government's point, right,

that they weren't sales at the standard transaction terminal.

They were behind-the-counter sales, call Mr. Boden sales.

Takes a bigger cut because of the anonymity and the ability to

provide what in his words were clean bitcoin.

MR. LENNON:  Right.

THE COURT:  So I mean to say -- if it's not -- what I

don't think is true from my reading is that the yellow sign

outdoors and the terminal inside, it's not just a buy and sell

bitcoin exchange.  So that's part of the issue.  There was

certainly a desire to get bitcoin customers in the door, but

then there was a desire to get some of them to the counter

where he could take a bigger cut in exchange for what his

competitive advantage was, which was anonymity.

MR. LENNON:  Well, yes, Your Honor.  We are not

disputing that the larger customers were directed to Mr. Boden.

But what I'm saying is that this is -- this is not a situation

where it was all word on the street or that we had some kind of

clandestine bitcoin sales going on.  That was the point there.

There is no doubt that larger transactions like in many

businesses they called Mr. Boden and he handled those.  But on

the -- he was not -- nobody is denying that anonymity was

important, but it's not only to protect or to undercut the bank

1    secrecy rules.  I mean, in bitcoin transactions, as I

2    understand, that if at some down time down the trail maybe up

3    to four times that bitcoin is used for some illegal purpose

4    they can come in and shut down accounts.

5           They -- there also, I believe, was an educational

6    curiosity of doing this.  And that also goes again to intent.

7    They did, albeit incorrectly, list bitcoin profits on their

8    2018 tax returns.  They have acknowledged they forgot it.

9    Didn't put it on the 2017, and obviously now going over the tax

10   returns they didn't declare it properly in 2008.  But this I

11   think underscores in some degrees the, you know, the nefarious

12   nature.  And there is no doubt it was illegal, and there is no

13   doubt that the intent that they had violates the statute, but

14   there is more to it.  Context is not everything but it's

15   important.

16          Finally, Your Honor, I just would address a couple

17   things here and that is, you know, we -- we ask the Court for a

18   non-custodial sentence, and -- but we understand that

19   Mr. Boden's conduct is certainly closer to that of

20   Mr. Dejager's than it is to Ms. Vogt, who also had some very

21   serious medical issues, which obviously Mr. Boden would like to

22   be here and help her through those.  But the one thing that I

23   think the Court can consider on general deterrent is the fact

24   that what happened to The Geek Group, what happened to

25   Mr. Boden was very, very public.  The public would probably not

1    know that Mr. Dejager, you know, lost his job, which is very

2    unfortunate and not uncommon.  That's -- usually when you are

3    charged and plead guilty to a crime you know who your real

4    friends are, and it's a shame that so many people abandoned

5    Mr. Dejager, but Chris Boden and the Vogts and The Geek Group

6    did not, and they are not abandoning Mr. Boden here today.

7             We respectfully ask for a sentence like Mr. Dejager's

8    of 10 months, and we'd ask that that is a reasonable variance

9    from what the effective or realistic guidelines would be, which

10   is level 21, criminal history category I.  And unless the Court

11   has some specific questions I know that Mr. Boden would like to

12   address the Court.

13            THE COURT:  All right.  I don't right now.  Thanks,

14   Mr. Lennon.

15            You don't have to say anything, Mr. Boden, but it is

16   your privilege to say whatever is on your mind, and more

17   importantly what you think should be on mine.  And if you'd

18   like to take that opportunity, you can stay seated there or use

19   the podium, whatever you are most comfortable with.

20            THE DEFENDANT:  Thank you, Your Honor.

21            I started writing this the night of the raid.

22            Just cool but be here for the love of God.  I

23   understand why they give you these to hold on.

24            Greetings, Your Honor, sir.  I am sorry.  I can't do

25   it.

1          THE COURT:  Just take a minute to settle yourself if

2     you can.  It's a very unnerving place to be obviously.

3          THE DEFENDANT:  I have been trying to read this for

4     days.

5          THE COURT:  But you have been in a lot of unnerving

6     places.  Not like this.  I understand that.  But get a little

7     settled.  Usually once you get started it's easier, and if you

8     need Mr. Lennon to read some of it to get you started he can do

9     that, too, but take a minute to get settled and try.

10         THE DEFENDANT:  Yes, sir.

11         I am sorry to the incredible people right behind me as

12    they have been for years, my friends, colleagues and community.

13    I am sorry that my shameful actions and idiotic choices have

14    left them as the real victims in this case.

15         I am sorry with everything that I am -- can you get me

16    through the first two paragraphs, please?

17         MR. LENNON:  I am sorry with everything I am and all I

18    beg is their understanding.  I am an idiot and now a felon but

19    I have taught them for decades that every person you meet has

20    something to teach.  I stand here today as a living lesson that

21    choices matter, actions have consequences, and that we all do

22    stupid things from time to time.  To all of you I am sorry

23    beyond words.

24         THE DEFENDANT:  There was no way I was getting through

25    that.

Your Honor, sir, I am radiantly naive and the dumbest smart person I know, but I am not by nature or nurture an evil man.  I have spent a lifetime firmly in the belief that curiosity never killed anything by a few hours, doing everything I could with whatever resources I could muster to educate, inspire and entertain anyone with a sincere and passionate desire to learn.

Don't wipe your nose on your suit.

THE COURT:  There should be Kleenex nearby, too.

THE DEFENDANT:  It's okay.  It's okay.

After spending a lifetime throwing lightning bolts across a room of children without killing anyone my ego compelled me to think I was far more intelligent than I am.  The world of bitcoin is the wild west.  It's nothing like science and engineering, and I was absolutely unprepared to understand the terrifying people it attracts and the subtle but powerful dangers it carries.  I quickly learned my ego is an unreliable narrater.

Wow.  I suck at this.

A crazy German once wrote, he who fights with monsters should be careful lest he thereby become the monster, and he was right.  I fought for logic, reason and common sense, and yet when I was given a choice to use them in the face of evil abandoned those lessons out of desperation, fear and stupidity. I rationalized it to myself as the lesser evil.  Better to take

his bad money and use it for good and then to not take it and
lose all we'd worked for.

Fuck.

I believed if I could hold it together long enough we
could find more ethical, honorable and more, most importantly,
legal means of support.  I fought foolishness and became a
fool.  I made bad choices to try and save my company.

Take over a minute.  I don't want to waste everybody's
time.

THE COURT:  You are not wasting time.  Just take a few
minutes.  You know, your natural habit in some ways is writing.
Not that you haven't done a lot of public speaking.

THE DEFENDANT:  Yes.

THE COURT:  But you like to talk about the science and
the things that excite you and this doesn't excite you.  This
is a burden.  I get that.  And so you take it out in writing,
and you know, the officer who is here, Officer Gonzalez, who
wrote the PSR, gave me your, what you called your dossier.

THE DEFENDANT:  She gave you the whole thing?

THE COURT:  All 500 pages of it, and I can't say that
I read every line in it.  There were several attachments, too.
But you know, you have a lot of good stories in there.  Your
Moonrise Kingdom story from your, you know, age 15, and that
experience.  I don't know if you've ever seen the movie
Moonrise Kingdom, but you know, you might want to watch it

1    because it's what it reminded me of reading your story from the
2    15 year old.  The reason I bring it up is you ventured off, you
3    and your companion at the time, and a lot of rotten things
4    happened.  A lot of good things happened that week, and you
5    came back and you managed to stand with the help of people who
6    were there for you in your life.  And you got your lawyer
7    standing next to you now.  And I think when all is said and
8    done, if you can read it yourself you'll feel better.

9           THE DEFENDANT:  Yes, sir.

10          THE COURT:  So just take a few minutes.  Just get
11   settled and do the best you can because this isn't the first
12   time you have walked into a situation where, you know, you
13   looked back and whatever you got out of it.  As you said, you
14   can learn from everybody.  There was plenty to regret.  And
15   there were other examples in your materials as well.  I get it.
16   Writing is a different thing than speaking out loud in a public
17   setting, especially to a Judge who has got to consider
18   sentencing, but I think when all is said and done, whatever the
19   outcome, you are going to feel more complete if you have
20   managed to read at least most of it.  So take a few seconds and
21   gather.  If you can't, Mr. Lennon is right there.  He'll read
22   it.

23          THE DEFENDANT:  This would just be a lot easier if I
24   could teach you how a Tesla coil works.

25          THE COURT:  You probably couldn't teach me.

1    MR. LENNON:  Put yourself in a turbine cleaning out

2    all the junk.

3    THE DEFENDANT:  Oh, thanks.

4    I made bad choices to try and save my company because

5    I was too stupid to realize we had already failed years ago.

6    We wrote 4,000 grant applications that year for three positive

7    answers and only one -- and one resulted in baseball tickets.

8    I am not smart enough to figure out how to pay the gas bill

9    with baseball tickets.  I was too stubborn, proud and stupid to

10   quit even though I was crying myself to sleep on a regular

11   basis in an unheated mechanical room that I called an

12   apartment.

13   THE COURT:  I didn't hear that.  That you called what?

14   THE DEFENDANT:  An apartment.

15   THE COURT:  Thank you.  Okay.

16   THE DEFENDANT:  It was up in the attic at the lab.

17   Age alone does not grant intellect, and wisdom is

18   something I've never been blessed with until the moment after I

19   needed it.  They filled libraries with things I don't know, but

20   I know right from wrong, and I know the bad choices I made were

21   wrong.  I knew it was wrong when I made the choices, but fear,

22   ego and stubbornness wouldn't let me accept the obvious

23   alternative.

24   Turbines.

25   Leadership is a gift given by those that choose to

follow.  More than anything I cared about not failing these
incredible people who counted on me.

Turbines.

My pride and desperate need to not fail them ended up
destroying it all.  Our entire community watched on the day of
the raid as my desperation and bad choices turned into
catastrophic and terrifying results.

The first person this hurt was a police officer who
had known us and followed our growth for years.  As I sat in
handcuffs on the front counter while the agents ransacked the
building, he leaned with his back against a post, not six feet
in front of me, quietly fighting back his own tears.  Seeing
this scared me more than the agents did.  He knew what was
happening in ways it would take me months to understand.

I really am much more eloquent than this when I am
composed.

THE COURT:  Take your time.

THE DEFENDANT:  We had already been circling the drain
for years, operating a loss of about $20,000 a month on average
and hanging by a thread.  Within 48 hours of the raid we had
lost every corporate donor and foundational supporter we had
worked years to earn.  On the third day we met together and all
agreed that we were out of business forever.  The government
did not shut us down.  The nuclear PR hit, which was entirely
caused by my bad choices, is what finally killed us.

1        I have accepted full personal responsibility for all

2   of the remaining debts, including a severance to the

3   magnificent seven, the staff members who stayed until the end.

4   It totals roughly $310,000 and is part of the personal

5   restitution I have been working on for years.  Starting shortly

6   after our shutdown I began making monthly payments and taking

7   tangible positive action to help the people that my actions

8   have victimized.  Instead of giving up and walking away as most

9   companies do, with only seven staff members remaining, we

10  stayed behind, cleaned the entire building and sold everything

11  we could.

12        Turbines.

13        The money went to cover bills, lawyers and the costs

14  of closing down a corporation.  My personal lab gear and tools

15  were often just given away as atonement, the first phase of

16  restitution to the real victims of my crimes, my students.

17        I suck at this so bad.

18        MR. LENNON:  Just take your time.

19        THE DEFENDANT:  The research equipment and tools, my

20  life's work, were handed off to young scientists and tinkerers,

21  many of whom traveled thousands of miles to have their vehicles

22  loaded to the rails.  Hundreds of people would come with a few

23  bucks saved up from their allowance and leave with tens of

24  thousands of dollars in equipment.  Dozens of personal

25  workshops, college degrees and even careers for young

scientists and engineers are now growing from those seeds I
cast to the winds years ago.  I still have the honor of working
with many of them on a daily basis as you have read in the
letters.

I lost my home, built it to an old mechanical room in
the lab.  I was one of many staff members to call the lab my
home and five of us still live together and work together to
this day.  My ignorance and bad choices instantly destroyed my
reputation, nullified years of my life, and changed the first
line of my obituary.  People don't read past the headline when
someone in the nonprofit world when someone is convicted due to
money, and in a time when we have an unprecedented need for
teachers, when our nation so desperately need those that
champion logic, reason and critical reason, I will never be
worthy to appear before a classroom again.

No rational person who chooses to spend a life working
in education is motivated by money.  We choose to make a
difference rather than making a profit.  I knew it would be
difficult.  I have lost everything I owned several times trying
to build this stupid dream, but the hardships we endured
together were a badge of honor we shared.

When you are 18 and during a Michigan winter working,
living and sleeping in a cavernous old warehouse with no heat
is an adventure.  It's a lesson in humility, discipline and
persistence.  Doing that in your 40s is just a miserable

torture and a daily reminder that you've made some pretty dumb life choices.

After working so many years chasing this impossible dream I am honestly just thankful it's over.  Certainly I wish I could have been smart enough and brave enough to have ended it myself.  I wish I could have ended it in just about any other way, but the job was killing us, and in my heart I am just thankful we are done.  I was trapped between my duty to the community, our volunteers screaming purpose, and a place to belong and a relentless debt of trying to shoulder too much responsibility with too little financial support.  I am a decent teacher but an incompetent businessman and have no desire to ever run a company again.

For decades I had the personal motto that there is no such thing as a failure that keeps on trying.  What I've learned in all of this is that the giant collection of Nike sports heroes saying never give up have never been in my shoes. Learning that there absolutely is a time to quit was the first of many hard lessons I have learned since the day this relentless nightmare began.  My new motto, by the way, is you cannot keep others warm by setting yourself on fire.

Your Honor, sir, I have been blessed with an extraordinary life.  I wasn't smart enough, fast enough to choose fun, bright and profit.  But the paths of science, nerds and nonprofit empowered me with the ability to serve others in

a million meaningful ways.  To service, the teaching and the
helping, that's my life.  I was trying to survive in the
dangerous world of business with too much ego and too little
education to put me in a position of no options but bad
choices.

       While I don't begin to understand a courtroom nearly
as well as a classroom, I imagine that most people standing
here with their heart in their hand attempt to convey how much
they promise to change.  They swear to become a completely new
person and you're tasked with the burden of balancing the
scales of justice.  On one side every saint has a past and on
the other every sinner a future.  I stand before you, Your
Honor, with all respect and deference to the power and
authority entrusted to you through nothing short of an act of
Congress and promise only to be who I already am.

       I am a shattered fool, a broken dreamer but a genuine
and good person, a slow learner who makes frequent mistakes,
but those mistakes come with lessons that I not only eventually
learn but immediately endeavor to teach to others.  I have made
a fool of myself publicly and often if it means that sharing my
scars can help others avoid getting their own.

       Many people I have had the honor to work beside who
have been through this exact stage of the criminal justice
system seem to do so by spending their present living in the
wreckage of their future.  I have not.  Certainly I am

terrified of what may come and the combination of not only
destroying my past work but so much of my future has given me a
Ph.D. in random crying, but instead of wasting that time I have
worked every day to build a new life from scratch and to
develop small scale resources to continue serving my community
at a manageable scale.

By myself with a tiny basement workshop and a handful
of weirdos, and sponsored only by a rag tag handful of my
fellow weirdos and nerds, I have created hundreds of broadcast
quality educational videos.  Many of them are even being used
for engineering classes at local universities today.  They were
made at zero cost to any school and given freely to the world.
I have made so many educational videos that I've had to create
three new channels just to broadcast them all.  There is over
60 episodes in the Project Archie robot series alone and I am
only halfway done with that.

Though disgraced I am not done.  With consistent
persistence I have helped hundreds of people in lasting,
tangible, positive ways through my roadside emergency project,
through getting a homeless family out of a seedy motel and into
a house they could afford, to buying a family in Virginia a new
furnace this Christmas, through helping a young son in
Pennsylvania pay his mom's mortgage a few months ago, to
building and giving away countless laptop computers, tools and
the occasional bicycle to people who just need a leg up over

the momentary hurdle in their life.  And these are just the best documented examples from the past year alone.  Not with The Geek Group.  Just me and some friends.

There isn't a person sitting behind me right now whose life I haven't improved in some positive tangible way, and this is only a small sample.  I have published three books in three years with three more in progress.  I have so many half finished good ideas and ongoing projects that I have a black belt in partial arts.  I do this, Your Honor, because it's who I am, because despite overwhelming evidence to the contrary, I hold a relentless belief in the fundamental good of my fellow man.  I know I carry an irrational level of optimism and my broken brain is hardwired with a compulsion to help people. It's how I've been my entire life and now I see it as more than serving my community.  I am impassioned with a need to atone for my sins.  The charges brought before me are by the entire United States, and thus, it's to the people up there that I owe my restitution and my service.

I don't wish to be a martyr, a savior or a hero, but I can be a decent, passionate, productive man.  I have learned through countless examples that the more I help others that the more I learn with myself as well.  The more people I have the opportunity to help the more resources and skills I develop to help even more people.  It's a cycle, and it's a wonderful circle of education and growth that I find rewarding beyond

measure.

I made a life-altering mistake.  I failed my
community, my friends, my family, and myself.  In a difficult
situation I made a very wrong choice, and I am fully prepared
to face the consequences for my actions.  I alone bear the
burden of that regretful choice every single day and have felt
the consequences of my actions in ways I never could have
imagined, most recently in a soul crushing experience in a
Wendy's parking lot.  However, with the gavel about to come
down on my head I understand that while I may have felt those
consequences over the past three years, in the eyes of the law
the only consequence is the one that you will impose today.

I have aged 20 years in the past four winters.  My
soul has been through a boot camp experience being stripped
down to the core, examined and built from scratch into the man
I truly wish to be.  I can confidently say without reservation
or assertation that I have grown to be a better person than I
was when this all began.

I promise simply to keep learning and teaching, keep
trying to help people and work every day to be ever so slightly
better than I was yesterday, and I will never work with money,
bitcoin or banks ever again.

I absolutely deserve to suffer and serve a sentence,
and my debt to society must be repaid.  I have literally
written a book on civics and community and understand the need

1    for law and order as a basis for a safe and civilized society.

2    All I ask, Your Honor, is to please help me through the

3    exceptional range and breadth of punishments at your

4    discretion.  Help me to serve my punishment in a manner that is

5    just to the people and yet allows me to still be a caretaker

6    for my wife and be a productive member of my community.  Please

7    allow me to continue building upon the foundations that I have

8    worked these past three years to establish.  I have long since

9    proven to be no danger to anyone and continue to do so much

10   good in the world if given a chance.

11        Thank you, Your Honor, for your patience, your

12   education and your guidance.  Thank you, Mr. Presant, for

13   saving me from the path of desperation driven stupidity I could

14   have fallen so much further down.  Thank you, Mr. Lennon, for

15   saving me from Mr. Presant, and thank you to everyone behind me

16   who has stood and supported me through this incredible,

17   exceptional life.  I am sincerely sorry I screwed it all up.  I

18   only pray that you will let me continue my work of rebuilding

19   it slowly, serving my community manageably as I have been these

20   past several years.  I remain as ever at your humble servant

21   and beg only your mercy.  Thank you, Your Honor, sir.

22        THE COURT:  All right.  Thank you, Mr. Boden.  I know

23   that was hard to get through but I am glad you were able to do

24   it.  Are there other things you want to say before you sit

25   down?

1          THE DEFENDANT:  I am happy to answer any questions you

2     have.

3          THE COURT:  I don't have any right now.

4          THE DEFENDANT:  Thank you, sir.

5          THE COURT:  Mr. Lennon, anything else from you?

6          MR. LENNON:  No, Your Honor.

7          THE COURT:  All right.  We'll turn it over to

8     Mr. Presant.

9          MR. PRESANT:  Thank you, Your Honor.

10         I know that the Court and Mr. Lennon and Mr. Boden all

11    heard the government's argument yesterday about leadership, so

12    unless the Court wants me to go through it again I am just

13    going to skip over and rely on what I said yesterday.

14         THE COURT:  I don't necessarily want to hear the whole

15    repeat but each sentencing is its own -- it's own record, and

16    so you'll at least want to highlight.  I think it's important

17    to hear the basics of the government's position.  But I

18    appreciate that Mr. Boden and Mr. Lennon were here, and of

19    course I was, but not everybody was.

20         MR. PRESANT:  Okay, Your Honor.  I'll go through it

21    more quickly than I did yesterday then.

22         The issue under the guidelines is that there is a

23    distinction between leaders and organizers who are involved in

24    schemes that have five or more participants, and leaders or

25    organizers of schemes with fewer than five participants, and

the guidelines also make clear that a participant is not limited to people who are charged as criminal Defendants.

And so there have been more criminal Defendants charged in this scheme, but the record, including the government's sentencing memorandum and attachments thereto, the government's objection letter and the presentence report, note that there were several other individuals who were not only involved in The Geek Group but were actually involved in the sale or the structuring conduct of the unlicensed money transmitting business, and so for that reason the government thinks the Court should find by a preponderance of the evidence that there were five or more participants and apply the four-level enhancement for being a leader as opposed to just the two-level enhancement.

Turning to the 3553(a) factors. I think that the arguments that the Court has to consider today really fall into two buckets. The first bucket is the conduct of the Defendant, and the second bucket is the presentation of the Defendant in connection with sentencing, not just his presentation here today but the presentation in the papers and the submissions to the probation officer. So let me start with the conduct in that first bucket.

The Defendant, there is no dispute, was the leader of not only The Geek Group but the unlicensed money transmitting business. He conceived of the idea to sell bitcoin as a

business at The Geek Group. He knew what he was doing was wrong and was against the law, which I'll get into a little bit more later while he was doing it and he did it anyway. And that's the core of the conduct, but of course, that's not the only conduct because there is money laundering.

The Court has heard this week about the mixing and tumbling that the Defendant and Mr. Dejager worked to do. Some of Mr. Boden's submissions to the Court suggests that that was only an occasional or experimental thing they undertook. Mr. Dejager's statement to the Court in connection with the sentencing, he said that he essentially mixed everything before he sent it to Mr. Boden to sell.

Part of the reason they were mixing was because the Defendant advertised to his customers on Facebook and in person with the undercover agent that he sold clean bitcoin. Other places like licensed exchanges, legitimate businesses like Coinbase, they sold, quote-unquote, dirty bitcoin, according to the Defendant. If a person didn't want to buy the bitcoin directly from the Defendant he would offer to, quote-unquote, anomonyze it for them.

So that's clearly the money laundering activity that's in the case, but it's not the only activity because there's also been discussion of how the Defendant took it upon himself -- much like he disregarded the laws he was violating knowingly, he took it upon himself to thwart the anti-money

laundering control that legitimate exchanges like Coinbase again for example had put in place in order to make sure that people weren't using bitcoin to launder money because the Defendant thought he knew better.

Mr. Boden also structured and aided and abetted and supervised the structuring of the cash deposits into the banking system of those approximately $740,000 in order to make sure that his scheme went undetected for as long as possible. And the Facebook messages summarized in the government's brief, sentencing memorandum, indicate that the principal Defendants here, Mr. Boden, Ms. Vogt and Mr. Dejager, all knew about the $10,000 requirement and were actively working for ways to transmit large sums of money to avoid the CTR being filed.

The thing we haven't talked about much this week so far is the attempted extortion attempt or the solicitation of the undercover officer.  And I think the first thing to say is that undercover operations like the one in this case, sometimes called sting operations, they get a bit of a bad rap because people think it's a setup or they are somehow being entrapped, but legally they aren't, but I think those arguments don't even apply here at all even kind of qualitatively, because everyone knew, as Mr. Lennon acknowledged, that they sold bitcoin at The Geek Group, albeit they sold it -- Your Honor is quite correct about the difference between the counter sales and the ATM that was used to draw people in.  But everyone knew they were

1      selling -- selling bitcoin at The Geek Group.  And the question

2      he was, well, what kind of business is this?  Are these

3      Defendants merely mistaken about what they are allowed to do or

4      not allowed to do or is something more nefarious going on here.

5      And the undercover operation in the first instance answered

6      that, right?  Because Mr. Boden, through the series of

7      undercover buys, set up kind of phoney limits of the amounts

8      that he had to stay under in order to, quote-unquote, be

9      compliant with the law.  Incidentally, he was wrong about all

10     those limits legally.  But even for the limits that he set for

11     himself, whether it was $1,000 or $5,000, he just blew past it

12     as soon as an undercover said, well, what if I want to get a

13     little bit more?

14              He also made clear that he was completely fine selling

15     to someone who was posing as a cocaine dealer.  He makes

16     himself self-serving arguments in reference to sentencing that

17     he was, in fact, uncomfortable, but I think the Court can look

18     at the fact of repeated transactions where he is proposing

19     higher and higher amounts for the person to buy and the

20     statements that he made therein during the undercover

21     transaction including, for example, that he wanted to be the

22     bitcoin empire for drug dealers, that he's been looking to find

23     the major players in town, that he wanted to get,

24     quote-unquote, the whole -- your world, being the drug world,

25     working on bitcoin are contrary to any kind of discomfort

associated with the idea of selling large sums of bitcoin to drug dealers to use to conceal and promote their businesses.

And then finally, there is this extortion plot, right? The undercover didn't go in there and suggest that he could -- he could take a hit order for Mr. Boden or that he could -- or ask Mr. Boden if there was any debts he needed collected?  This was just something that Mr. Boden brought up of his own volition because he thought it was an opportunity in order to get some money, some $500,000 that he said he was owed by another person.  And we have attached some of the statements that Mr. Boden made during those undercover deals to our sentencing memorandum and we've quoted some therein.  And I am not going to go through all of them in the interest of time, but I think the nature of those statements is really important to indicate, well, what kind of business was this that he was running?  And one of the things Mr. Boden said was -- to the undercover was about this person, if all I wanted to do was F him up, his head in a burlap is easy to do.  I want my money. I don't give an F about him.  I don't give an F about his family.  I want my money.  Just one more example.  What happens to him I don't give an S word.  You kill him he ain't going to pay me, and I don't need him dead.  He is dumb.  How you handle this, this is your world.  I care that I get my money back. Beyond that it's whatever is most efficient for you.

I mean, when I read those words for the first time I

1    was chilled.  I mean, those -- to make those statements and

2    then to come to court and represent that this was all some sort

3    of a technical regulatory violation where the Defendants did

4    not know what they were doing was wrong I think is jarring and

5    belies the evidence in the case.

6          I think one last point here is that even Mr. Dejager's

7    statement to the Court, which I have already told Your Honor I

8    thought was quite genuine and showed an appropriate amount of

9    contrition, he indicates that even amongst the rules of the

10   bitcoin community, the people who were drawn into bitcoin,

11   Mr. Boden broke the ethical rules there, too, by retaining a

12   black book of seed phrases, which essentially is the same as

13   possessing the currency that he sold to his different

14   customers.  And in Mr. Dejager's view -- I understand

15   Mr. Lennon has an explanation for it here today, but in

16   Mr. Dejager's view there was no ethical reason for those seed

17   phrases to be retained.

18         So let me turn to the second bucket of considerations

19   for the Court under the 3553(a) factors.  I think Mr. Boden's

20   presentation to this Court, like his wife's yesterday, is

21   concerning, and in fact, I think it's far more concerning than

22   his wife's presentation to this Court because Mr. Boden wants

23   to have it both ways.  If he just came to Court in connection

24   with the sentencing process and said, I was desperate for

25   money, I knew what I did was wrong when I did it, I did it

1    anyway, I am ashamed of my actions, that would be one thing.  I

2    think we got a little bit more of that today, but in his

3    statements to the probation officer, a branch of the court, he

4    does anything but that.  Right?  He essentially says, I didn't

5    know what I was doing was wrong, and he refers to this

6    prosecution as, quote-unquote, foolishness.

7            And there is this example of the FCC thing, which

8    Mr. Lennon brings up again today, and the first thing I think

9    to point out there is that's essentially like saying, because I

10   got a parking ticket one time I can't believe that when I was

11   selling drugs the government didn't just come and tell me to

12   knock it off.  Right?  The point is that the type of conduct

13   that you are engaged in is what beckons a particular type of

14   response for the government, and to say that the government

15   overreacted here or overreached in Mr. Lennon's words, I think

16   is to essentially blame the government for what is, in fact,

17   the criminal conduct that the Defendants undertook.

18           And to put a fine point on this, I think, unlike

19   Ms. Vogt, which the Court observed yesterday, knew her conduct

20   was unlawful but may not have known the chapter and verse,

21   there is no doubt, based on the evidence in this case, that

22   Mr. Boden, in fact, did know the chapter and verse of what he

23   was violating.  The government attached evidence of this to its

24   sentencing memorandum.

25           So I'm looking at page 45 of Exhibit 1 of the

government's sentencing memorandum, which are Facebook messages from November 4th, 2017 between Mr. Boden and a person whose name has been redacted.  And in one of those messages Mr. Boden sends an article to that person, and the title of the article is a Michigan man has been charged with running an unlicensed money transmitting business after selling more than $150,000 in bitcoin.  And he asks the person, do I have a problem?  And the person responds, look up Title 31 § 5330, which is, of course, the codification of the Bank Secrecy Act provisions that Mr. Boden violated, and Mr. Boden's reaction to that in summary was to go on and run this business for another year, and he essentially goes to Mr. Dejager and says, I looked into it and what I figured out was if I sell more than $1,000 in bitcoin I better make sure that they are not a fed.

I think the Court can also look to the repeated falsehoods in Mr. Boden's statement to the probation officer in evaluating the 3553(a) factors.  He says he paid taxes on all the bitcoin when he sold, when his counsel now concedes that that's not true.  He says he mostly moved a few thousand dollars a week, when, it fact, the evidence shows there were some weeks when they moved far more than $10,000.  And I could go on and on from there, but when Mr. Lennon says many of the things that Mr. Boden said to the undercover were objectively false, I have to agree with him, but the problem is that so many of the things that Mr. Boden has said even to this Court

is objectively false, and I think that makes it a very difficult thing for the Court to do to sort through which contrition is genuine and what is not.

The other theme that he touches on in his statement is to say this idea that I mentioned of this is all the government's fault.  You know, he says, I can't imagine how many crimes I commit every day if this is a crime.  He takes some ad hominem shots at the federal agents who investigated this case.  He says that the prosecution needs a sense of humor, which is, even though his counsel tries to clean it up in the sentencing memorandum, it's essentially saying that this whole process is a joke.  And he even goes onto say that this Court should be spending its time not on cases like this but cases where this sort of attention is really needed.

And the other thing I noticed, too, in his sentencing memorandum, the attachments thereto, or maybe it's the motion for variance, that a lot of the letter writers echo these same things -- things I talked about.  They claim that he paid taxes on everything that he sold.  And that's Exhibit 2.  He did so without realizing the full extent of the illegality of his actions.  The agents were storming the building and terrorizing the volunteers.  Exhibit 3 says if Chris's actions were outside the bounds it was because of ignorance of laws that he was not aware applied.  Exhibit 4.  At no point did I ever think that Chris was willfully violating any regulation.  And I could go

1    on and on from there, but the point is that he is presenting to

2    the Court as someone who says he didn't know what he was doing

3    wrong was wrong at the time that he did it when the evidence

4    shows that he knew exactly what he was doing.

5         So what does all this mean for the 3553(a) factors?

6    One of the factors Your Honor knows is the need to promote

7    respect for the law, and I think what Mr. Boden has shown the

8    Court is that to this day he has very little respect for the

9    law.  If Coinbase is doing something in order to comply with

10   the law he's going to find a way around it.  If he is told that

11   he's not allowed to engage in certain conduct, he is going to

12   say, well, I am just going to go ahead and do it anyway even if

13   I know what I'm doing is a crime.

14        As Mr. Dejager acknowledged, the two of them were

15   drawn to anarchy and the need to depose of government

16   controlled currency.  I think what the Court can look at is

17   that Mr. Boden decides which laws he wants to follow and which

18   ones he doesn't, and I think the Court's sentence has to

19   reflect the need to promote respect for the law in Mr. Boden.

20        I think the need for general deterrence here is

21   largely evident in the way cryptocurrency is growing in society

22   right now.  I think that regrettably there are a lot of Chris

23   Bodens out there.  I think there are people who think that

24   cryptocurrency exists outside the bounds of the law, and I

25   think the Court's sentence should reflect that the conduct here

1    cannot be tolerated because bitcoin, like other funds, are

2    subject to the laws of the United States of America.

3          Third, the Court has to consider specific deterrence,

4    or as the guidelines say, the need to protect the public from

5    further crimes of the Defendant.  And in the two sentences

6    earlier this week, the Court acknowledged that Ms. Vogt and

7    Mr. Dejager probably don't need specific deterrence because

8    they are going to be pretty careful I think for somewhat

9    different reasons to avoid breaking the law again.  I don't

10   think Mr. Boden is like Ms. Vogt or Mr. Dejager at all in this

11   respect.  I think a sentence of probation or a minor sentence

12   of incarceration Mr. Boden would consider it to be essentially

13   a vindication that his prosecution was, in fact, a joke.  He

14   says he is done with bitcoin and maybe so, but I don't know.

15   If he didn't get -- if he doesn't get a significant sentence

16   that makes him understand the wrongness of the conduct that he

17   engaged in, I could see him going back to bitcoin, and if he

18   doesn't go back to bitcoin I think whatever scheme comes next,

19   Mr. Boden, if he finds out that he is breaking a law, will take

20   the same tact that he took before without a significant

21   sentence, which is to say he'll decide whether it's a law that

22   he deems in his own judgment needs to be followed.

23         Now, finally, I'll make a couple points I also made

24   yesterday, Your Honor, which is I can't speak to the good works

25   that The Geek Group in general and Mr. Boden in specific did in

the community.  The government doesn't investigate good works
of nonprofit organizations.  I also can't speak to the fact
really -- well, I suppose I could speak to it, but it's of no
knowing how much or how little money the Defendants actually
made out of this particular scheme.  I mean, they made tens of
thousands, maybe a little over $100,000, but a split amongst
them over the time they are looking at it wasn't a ton of
money, but those factors don't make this any different than a
drug case, and that was the point the government was making
yesterday.  Not the point, to respond to Mr. Lennon, that these
Defendants are akin to drug dealers.  Obviously, those are
different crimes, even though the Defendant willfully serviced
or offered his services to drug dealers.  So those -- those
aspects of sentencing are no different, right?  Drug dealers
have families to support, and I've heard many a drug dealer
say, this was the easy money.  This was the way that I could
support my family.  But it doesn't make it right.  No matter
how good of a motive you have is not a license to break the law
in order to make money in order to serve that motive.  That's
what the rule of law means fundamentally.

        And then secondly, to distinguish the Defendants from
that street drug dealer who often does not have a great
education or great opportunity, the Defendants here clearly are
all extremely intelligent, extremely talented and extremely
prolific people.  They do have legitimate means to make money.

1      They just wanted the easy money instead.

2              And I think I'll end on the point that if when you

3      look at those good works, and you think about what that means

4      in the context of the sentence of the case, it really reveals

5      to you I think the duplicity of the crime.  I assume that the

6      people in the back of the courtroom and the supporters of

7      Mr. Boden are probably surprised by some of the things that he

8      said to the undercover agent.  They are surprised at the nature

9      of this business that was undertaken, but the reality is that

10     when you break the law there needs to be accountability for it,

11     and in the government's view the 3553(a) factors require a

12     significant custodial sentence in this case.  Thank you.

13             THE COURT:  All right.  Thank you, Mr. Presant.

14             Do you want to respond, Mr. Lennon?

15             MR. LENNON:  Yes, Your Honor.  If I may?

16             THE COURT:  All right.

17             MR. LENNON:  I think I have got five points.  I'll try

18     to go through them quickly.

19             Count 28 -- and Your Honor, obviously Mr. Boden from

20     the beginning was willing to plead to everything but Count 28.

21     The context is so important here.  He has never denied the

22     language, the very colorful language, the puffing, the

23     salesmanship, but the Court has got to understand that we got a

24     struggling, desperate organization.  There is a person who they

25     have lent money to.  They have hired Vello Law firm to try to

collect the money.  Vello has not been able to do so and

Chris -- terrible decision -- sees this guy from another world,

and thinking that he could help him out, this African-American

agent, I don't even know who he is because I know the IRS

protects that identity.  And he does, he asks for assistance.

He offers the same percentage rate to collect the debt as Vello

Law.  There is context to this.  And he goes back to the

desperation and the bad choices that he's always taken

responsibility for.

No. 2, taxes.  Mr. Boden doesn't do the taxes.

Ms. Vogt has done the taxes and he thought that the bitcoin was

covered.  We later realized it wasn't.  It was left out of the

2017.  It was shared with the probation officer and with the

prosecution.  It was clarified.  And then in looking at the

return, we saw that it's there, just not done properly.

No. 3, the black book.  Mr. Dejager is wrong.  In

bitcoin you have a password and you have a 12-character -- at

least minimum 12-character phrase for your accounts.  Those

were accounts the vast majority for Mr. Boden.  What's wrong

with having those in the book?  But you have got friends,

trusted friends of his who asked him, hey, can you keep our

password in there?  He did.  He had some elderly customers that

said, could you keep an extra password?  That's because they

trust him.  Mr. Dejager is operating thinking, I am mixing this

and I am doing all of this.  Well, these are people who trusted

1    Mr. Boden and not a single one has lost money.  Not a single

2    one, because he is trustworthy.  And you know Mr. Dejager's

3    reaction to this?  I wasn't at the proffer, but -- and I don't

4    know how it was presented to him, but there is nothing

5    nefarious about this black book.

6         I have lost count.  Maybe four.  Throughout this time,

7    both in the response to the motion to suppress and in the

8    sentencing memorandum, the government has a conversation in

9    there with some ellipses.  We filled in those ellipses.  It's

10   not what has been presented by the government.

11        Six points.  So here is five.  Your Honor, I

12   understand Mr. Presant having done that job and talking to the

13   undercover agents, seeing that information at the time of the

14   raid, December of 2018, and being very alarmed.  No dispute.

15   Executing a search warrant, I don't know what all they were

16   looking for.  That's fine.  No problem there.  But what

17   happened in the over two years with all those federal agents,

18   not a single one sitting at table here.  What happened to find

19   out what was really going on in The Geek Group?  I tell you

20   what wasn't happening, Your Honor.  There wasn't any financing

21   of terrorist organizations.  There wasn't any financing of a

22   drug trafficking organization.  There was no real money being

23   made by Mr. Boden or any of the other people there.

24        So to the extent that there is frustration, they had

25   over two years to look into what The Geek Group was actually

1    doing, and that's the nature of the comment.  Doesn't this

2    government have something better to do then take down a

3    community service organization, one that got the highest rating

4    for ethical behavior by the folks who rate those things?

5    That's where the frustration comes from.  It's not a disrespect

6    for the law or this Court or anyone else.

7              And finally, the comment that we don't need anymore

8    Chris Bodens in the world.  I strongly disagree.  We need more

9    people like Chris Boden serving their communities, making his

10   mistakes but admitting it.

11             Thank you, Your Honor.

12             THE COURT:  All right.  Anything else, Mr. Presant?

13             MR. PRESANT:  Your Honor, I think a number of my

14   statements were mischaracterized but nothing I wish to respond

15   to on the record.  Thank you.

16             THE COURT:  All right.  Well, thank you to the parties

17   for their presentation, to Mr. Boden for working his way

18   through the written statements so he could express himself

19   directly here, and of course, to our probation officer for all

20   the work she did pulling together the information.

21             We have a guideline determination that I'll start with

22   in a minute and then we have, after the guideline

23   determinations, whatever it is, a question of what's sufficient

24   but not greater than necessary to achieve the purposes of

25   sentencing.  What the parties have been talking about is § 3553

factors because that's the way we proceed in any sentencing
case, including in this one.

I want to start with a couple of general comments that
I think will carry forward through the rest of what I have to
say on the specifics of the sentence that I intend for
Mr. Boden, and the first one is, and really to address what is
the problem here?  Why do we care?  Why isn't this a laughing
matter from the perspective of law enforcement regardless of
whether they found everything they were looking for or just
what we're here to deal with?  And you know, the fundamental
problem here with the case is not simply that cryptocurrency
was involved.  It's perfectly legal to buy and sell
cryptocurrency, bitcoin or otherwise, and the government has
never suggested otherwise, and neither has the Court.  I think
it's pretty risky right now.  It's definitely a wild west
experience.  The price, volatility and all the rest create
strong investment risk, and there is, it seems to me, for any
sovereign nation a genuine threat to their ability to manage
the economy if they don't have a grip on cryptocurrency, which
is to some segments of society part of the appeal of
cryptocurrency, and that's one aspect of concern.

But the one that's really fundamentally at stake here
is the need that the federal government has seen fit to codify
in criminal law proceedings, to keep track of where that money
is moving in our system to avoid letting bad guys use money

1    transmitting devices, to get cash in support of nefarious

2    activities.  As Mr. Lennon indicated terrorism was the

3    fundamental concern of Congress when they broadened the

4    statutes that we are here talking about in the Patriot Act in

5    the wake of concerns about terrorism in particular, but it's

6    not the only one.  It's also drug dealing, which is another

7    business that obviously values anonymity, and any other

8    business that similarly wants to avoid exposing itself or

9    raising its head in a way that would put them on law

10   enforcement's radar.  Really the kinds of things that the

11   six-point enhancement in guideline 2S1.1(d)(1) covers.  And

12   that does apply here, both sides agree, with respect to

13   Mr. Boden's knowing or believing at least some of the laundered

14   funds were proceeds or intended to promote offenses involving

15   controlled substances.

16           That's the risk and concern that drives what's

17   happening here, whether or not the worst was realized, the door

18   opening risk happened not just because bitcoin was being sold

19   and purchased, but because it was being sold and purchased in a

20   way that allowed customers who wanted that aspect or that

21   service from The Geek Group to move value, move money from one

22   place to another without it registering in the normal financial

23   system.  That was part of the business model, frankly, of The

24   Geek Group or this aspect of The Geek Group when it got to

25   selling bitcoin in, I think Mr. Presant's words, and as part of

the, ultimately the words that Mr. Boden used, you know, it was
important to him in the exchanges with Mr. Dejager that are
part of the written record saying, look, this has to be clean.
This has to be clean.  Will it be clean?  Because that's what
The Geek Group or Mr. Boden at The Geek Group offered his
bitcoin customers, a clean anonymity that wasn't available by
using traditional bitcoin exchanges.  And then the other
Defendants in the case made sure that they didn't drop the
penny on the other side by dumping a bunch of cash into a bank
account that would then be recorded under the structuring
rules, but instead structuring the deposits in an effort to
avoid that.  And that's the seriousness or the concern, not
that somebody was stolen from or lost money.  Not that somebody
actually did finance terrorism or anything more than say
marijuana sales or at least consider the cocaine sales, but
it's those risks that are at stake and that are fairly
vindicated by the government and investigated by the government
in my view.  So that's a general comment that I would want to
start with.

     And it's not -- the second general comment.  It's not
an indictment of The Geek Group as an organization or all it
did.  It's an indictment that focuses on some activities, some
limited activities toward the end of The Geek Group's life that
involve using the bitcoin as a money transmitting device for
some people, some customers who valued and were willing to pay

for the anonymity because, let's face it, the pieces or the

customers rather that were using this service were paying

higher cuts to Mr. Boden or others selling it then they would

have had to pay on the exchange because they wanted the

anonymity.  It was part of the business model.

Rather, The Geek Group itself a much broader

organization.  One that had a whole different mission and

actually provided valuable services from all accounts to the

community.  The problem was long before bitcoin started, long

before the agents showed up to do their search, The Geek Group

just didn't have the capital it needed to survive.  Never did.

And I don't think that's disputed.  It was, despite the 400

grand app grant applications, unable to land enough that they

needed and they did not have financing and the reality is The

Geek Group was going under no matter what unless there was a

big grant or some other unexpected source of revenue, something

they hadn't had in all of their years of good service.  And I

think in some ways that's an important point to remember at the

beginning as we talk about this, and it's an important point

for Mr. Boden to remember, too.  It's not even just the agents

who came or the PR that followed.  The Geek Group was

financially starved long before any of that happened, and I can

see and hear in his own comments that the death of that dream

or as he says there was a time to stop, and he went farther

than he should have, is very painful as it would be for any of

us who have wrapped ourselves up in pursuit a dream, a good dream and a worthy dream only to see it come to an end and then an end in a very ignominious way in this particular case.

But that's background, and I hope it will be germane to what I talk about in the more particulars of this case my intended sentence for Mr. Boden.  And I do need to start with the guidelines because that's where we always begin, and under the presentence report we are at level of offense 35, criminal history category I based on all of the things I talked about earlier.  The only thing the Defense contests is the role enhancement suggesting that it should not be more than two points, not the four points that the officer added for activity involving five or more participants, not five more or criminally charged people necessarily, five or more participants or was otherwise extensive, and I am going to overrule the objection.  I think the guidelines are properly scored by the officer in this case.

The one thing that has been clear to, me after reading an awful lot of material about the case, is what Mr. Lennon himself says.  Entire charismatic leader, driving force, whatever other word you want to use of The Geek Group, and its later foray into using bitcoin as money transmitting was Chris Boden, and even if you -- I think you can hear even today in the halting words and sometimes the words through tears a level of charisma is why people would be drawn to somebody like Chris

1      Boden.  You certainly see it in the written materials and you

2      can see it in some of the other attachments that he provided.

3      He was an inspirational leader, a charismatic leader who in my

4      view overshadowed everything else that happened in The Geek

5      Group for good or ill, and I think that's why the four-level

6      enhancement fits here and why I didn't find it appropriate to

7      award managerial rule adjustments for anybody else.  He was sui

8      generis.  He was completely different in my mind than anybody

9      else involved in the organization, and even if -- I don't think

10     I need to necessarily count exactly five or more participants.

11     We could probably do that with the government's submission, but

12     it was in my mind undeniably otherwise extensive, and that's

13     also a basis for the four-point enhancement.  And you know, the

14     example that the guideline commentary uses for otherwise

15     extensive is well, even if something involved only three

16     participants but there were unknowing services of many

17     outsiders you might be extensive, it could be considered

18     extensive, and that's not exactly what we are talking about

19     here but it fits to me the paradigm, the idea that this entire

20     operation, for good and ill, really owed its existence, its

21     energy, its ongoing operation to one man, Chris Boden, and I

22     think in the guideline parlance that's an appropriate place for

23     the leadership enhancement.

24          So I am going to stick with the way the officer has

25     calculated the guidelines, and that means that we have a

starting point of 35 and criminal history category I and 168 to
210 months.  But then we get to the other factors and in my
mind that's way too much.  I think the guidelines significantly
overstate the actual seriousness of what we are talking about
in the case, and I've said that in the sentencings of the other
individuals as well.

And in particular, one of the reasons that I think the
guidelines significantly overstate the seriousness is that 14
of those levels are attributed to the total funds involved in
the laundering activity.  Here, 740 or 50,000 dollars or
thereabouts.  And that's the same 14-point enhancement that
would apply if Mr. Boden had stolen 740 or 50,000 dollars from
somebody, and I think everybody agrees that's not what we're
talking about.  We are talking about the actual structuring or
laundering activity, but nobody lost any money in the process.
Maybe some people paid more than they could have paid as a
mission or otherwise to purchase or sell bitcoin compared to
what they'd get on an exchange, but you know, they got
something for it and they got something they wanted, which was
anonymity or clean bitcoin.  So that's, I think, a starting
point that significantly reduces the overall seriousness of
what happened here.

That said, the other things that I think still are
serious and still are appropriately scored are things that
we've already touched on.  The reality is that in this case it

was still a significant amount of laundered money, some of
which at least Mr. Boden was chargeable for the added six
points because of the activity involving controlled substances.
And I know Mr. Lennon says some of the statements that
Mr. Boden himself made when he was interacting with the
undercover officer were just puffing, but it's hard to know
that when you don't have a complete factual record of.  What we
do know is the 700 and some thousand dollars moved, that
multiple people noticed marijuana smells on the customers or
some of the customers and that Mr. Boden himself, the
charismatic leader, in speaking to a third-party, is saying for
years the marijuana people were the backbone of his business.

       When you put that altogether, I think it really leaves
an inescapable inference when, in fact, that was an important
part of the business, and more than that, a fitting part of
this business because of the emphasis on clean.  It wasn't just
philosophical objections to the government tracking money
generally.  It's because he had customers that had reasons for
wanting it clean, and he knew it because in some of the
exchanges that the parties had focused on in the briefing.
They didn't talk about it today so much, but the Facebook
exchanges where Mr. Lennon's brief says, hey, you need context
here.  The swear words he uses in all caps have nothing to do
with getting found out as a potential launderer but for failing
to test the siren at noon on Friday.  And that may be, but it's

also unmistakable in the exchange with the lol and other
things, that when money laundering is mentioned it's on
Mr. Boden's mind and it's a wink and a nod.

So there is plenty of basis in the record to infer
that that six-point enhancement is earned, and then, if you
think about it from a law enforcement perspective, regardless
of who put it on law enforcement radar it may be that Mr. Boden
is right that a disgruntled former employee who had his own
problems told stories that were weren't true.  That were
themselves over rout, but at that point the government has to
figure out what to do, and one way to test it is to go in with
an agent and see what the charismatic leader says, and when
this person goes over the course of more than one occasion,
they not only hear about the marijuana, they get invited for,
you know, bigger amount of money knowing it would have been for
cocaine proceeds at that point, and an eager invitation from
Mr. Boden to become engaged in that part of the business.
That's what he wanted.  And you know, it may have been that he
was desperate to keep the dream alive and thought this might --
this might be the way.  That could be.  That's the way a lot of
people commit crimes that involve fraudulent behavior or other
behavior that violates the financial laws of the United States
because they are under pressure often for good things.  But it
doesn't mean they are not accountable for the action.

And then really, as far as I can tell, completely

1   unsolicited by the agent, the one call that Mr. Presant says

2   gave him chills, and that Mr. Lennon says needs more context,

3   you know, I don't think you can really dress that one up with

4   context.  Here is a guy who is really mad that he is not

5   getting his money and he doesn't care about the guy or anything

6   else but getting his money, and he doesn't care about the

7   means.  The only objection that he has to killing the guy is

8   that he couldn't get his money back.  So it's pretty hard to

9   clean that up with context.  Again, maybe desperation, desire

10   to get money, but the reality is, from law enforcement's

11   perspective you are starting to hear things from the

12   inspirational leader that make you think maybe the guy who came

13   and told us stuff, you know, has something.  And that's not the

14   kind of investigation where you knock on the door like an FCC

15   agent and say, hey, you guys realize that we've got a problem

16   with your phones or your walky talky?  You know, that's the

17   kind of investigation where you go in and find out and have to

18   go in with search warrants and privacy and all the rest and

19   test it.  And it's good for everybody's sake that they didn't

20   find the worst of what somebody may have expected or feared,

21   but they did find and confirm what we're talking about today.

22   So there needs to be, I think, accountability for that, and I

23   think Mr. Boden is appropriately accountable for it in some

24   fashion but not anywhere close to the guidelines.

25          The other thing that has come up, and it's a lot of

the back and forth in the briefing is, well, does Mr. Boden really care?  Has he really assimilated acceptance for this, you know, or is he really still wanting to blame the agents or pawn it off as a laughing matter?  And I think both sides have things to talk about there.

Mr. Presant has certainly pointed out in his briefing in particular and somewhat here today some of the almost flip comments that Mr. Boden has made in various places about this, suggesting that, you know, at least sometimes maybe when he wakes up in the middle of the night he wants to blame the officers for what happened.  But I do think there is a genuine heartfelt acceptance, the kinds of things we heard and saw here today, that at the end of the day he is accountable, and it was his set of mistakes that is what led to this, not the agent's, not even the PR that followed the agent raid, but his own set of errors.

And frankly, like a lot of people who confront the death of a dream, especially a financial dream, I see this a lot with people who are convicted of financially related crimes.  Acceptance is a process.  It takes a while to come to grips with the reality that in pursuit of what you thought was a worthy, desirable, honorable goal that a lot of other people thought was and that maybe, in fact, was, you crossed lines that Congress has created felony boxes around and you crossed it knowing what you were getting into at some level or at least

1    knowing you were crossing the lines and it feels totally
2    inconsistent with the person you think you are and have been
3    and certainly the person you have aspired to be, but I don't
4    think that -- I don't think it rises to the level of a
5    situation where Mr. Boden has failed to accept that he is
6    responsible for this.
7          What I do think, unlike Ms. Vogt and unlike
8    Mr. Dejager, some of the same things that drive the charismatic
9    attacks of Mr. Boden make him a risk.  There is -- there is
10   always a dark side to charisma, and so unlike some of the
11   others, including Ms. Vogt and Mr. Dejager, I think there is
12   some need for specific deterrence for Mr. Boden, if for no
13   other reason than to help him continue to reflect on things
14   that he started to say and think here about what happened, why
15   it happened.  And I can't tell.  I often have uncertainly in
16   looking at as many pages as I've I looked at on this I can
17   often see in my own mind a pathway to where the seeds were,
18   what happened.  I don't really know that here.  You know,
19   certainly there was a lifelong concern about bullies and not
20   liking bullies.  None of us really like bullies.  And maybe
21   there was a more emotional connection to that than some, but I
22   don't know where that all comes from.  But it could come back.
23   I don't think Mr. Boden's charisma is going away.  It's going
24   to be there forever.  And what we certainly want is to
25   encourage and shape that in positive directions, the kinds of

things that he wrote about when he went to the high school and
had at least a couple people there, one in particular, who were
able to tap into the good side of that charisma, and that's
what we hope happens here as well, but I think that that is a
distinction between Mr. Boden's case and the case of the
others.

So ultimately the guidelines are too high in my mind,
but some custody is necessary in my mind to achieve appropriate
general specific deterrence and proper reflection of the
seriousness of what did happen, not just what didn't but what
did, and I intend a custodial term of 30 months, which is
longer than Mr. Dejager, a lot less than what's on the
guidelines, but I think sufficient but not greater than
necessary to achieve the purposes of a sentence that I think
are in play here for the reasons I indicated.

I don't know exactly what to recommend to the Bureau
of Prisons.  Certainly educational and vocational opportunities
are things that will occupy anybody meaningfully, and I hope
Mr. Boden takes advantage of that.  I know in his statements to
the Court, you know, he has indicated he doesn't have anything
he wants to learn from anybody in prison, and I hope he
revisits that.  You know, what he said here today, one of the
things he said was you can learn something from anybody, and I
totally think that that's true, and I think he is going to be
surprised when he gets to the Bureau of Prisons' facility.  I

1    think he is going to find the mix of people here pretty much

2    like the application of people out there.  There is going to be

3    some great people.  There is going to be some rotten people,

4    and there's going to be some people in between, but I hope he

5    uses that curiosity that's been driving him since little kid

6    days to find out what drives those people and to make

7    connections there that can be meaningful and helpful, because

8    you know, everybody there, almost everybody comes back.  A few

9    people don't because their sentences are so long, but almost

10   everybody comes back, and yes, they come back with a felony

11   conviction, and so does Mr. Boden, but it doesn't mean they are

12   gone from our community.  And the good things that they have to

13   bring are things that we want to nurture, and I want that to be

14   the case in Mr. Boden's life as well.  And the bad things are

15   the things we want to deter.  But that's the one thing I hope

16   he revisits in terms of his approach to serving a custodial

17   sentence.

18         I think I've said at one of the sentencings, you know,

19   in 15 years I could probably count on one hand the people I

20   have sentenced that I really don't especially like.  And that's

21   true here, too.  I like Mr. Boden.  I have enjoyed very much

22   hearing from him, reading what he had to say, thinking about

23   the things he's done.  But that's true of a lot of people.  A

24   lot of people for a lot of reasons cross the legal line and

25   commit felonious activity.  You know, there is the whole range

1    of people from the violent ones to the nonviolent ones, but

2    they all have stories that go way beyond the criminal activity

3    that lands them in front of me.  And I hope -- one of the

4    people that I sentenced wrote a book about it, and maybe

5    Mr. Boden will be one of those people, too, about the

6    experience in the Bureau of Prisons.  And that was Jay Vincent,

7    former basketball player for Michigan State who pleaded to a

8    fraud related crime.  And he came out I think in a different

9    place and a better place in some respects, though, of course,

10   as he would be the first to have told us that's not the way he

11   wanted to learn anything, but nonetheless, he did.  So I'll

12   recommend educational and vocational opportunities.  It may be

13   that Mr. Boden has more to teach there than learn, but in any

14   event, the Court intends the 30 months custody.

15         I intend three years of supervision to follow,

16   including the normal mandatory terms, which would be

17   cooperation in the collection of DNA and drug testing and

18   standard conditions, including no firearms.

19         I do intend special conditions, first, that Mr. Boden

20   provide the probation officer with access to requested

21   financial information, and two, that he perform 150 hours of

22   community service over the 30 months as directed by the

23   probation officer.

24         In terms of financial matters, there are three counts

25   of conviction, which means a $300 special assessment that I

1    intend to impose.  There is also forfeiture, first of all, of

2    some in kind forfeiture involving virtual currency that either

3    will enter or may have already entered because I think it's

4    applied to all three Defendants.

5          And then a money judgment in the amount of $75,000,

6    which I intend to enter as well as part of the plea agreement.

7    In light of that I don't think any additional fine is

8    warranted.  I intend to waive any additional fine.

9          So that's the overall intended sentence of the Court

10   and the reasons for it.  Government legal objections?

11         MR. PRESANT:  No, Your Honor.

12         THE COURT:  Mr. Lennon, legal objections?

13         MR. LENNON:  No, but would the Court consider a

14   delayed reporting?  As the Court knows, Ms. Vogt has numerous

15   surgeries next month, and as we all know, the Bureau of Prisons

16   could score Mr. Boden I assume to a camp and have to move

17   quickly.  Would we be able to ask for no -- no report date

18   before, you know, blank 90 days or something like that just to

19   get her through the surgeries?

20         THE COURT:  The problem is, I don't know specifically

21   about Ms. Vogt's surgeries.  I know that there is certainly

22   medical things, but they are constant.  They are not going

23   away, and so then what do I do if there is complications?  I

24   think I am not going to grant that today.  If you want to file

25   a motion or something happens and you think you want to ask for

1    additional delay or something like that I'd consider it, but

2    no, I think the normal reporting.  Certainly self report.  I

3    don't intend to remand Mr. Boden today at all, but self report

4    is appropriate at whatever time the marshals would designate

5    through the -- or the Bureau of Prisons through the marshals.

6         MR. LENNON:  Understood, Your Honor.  And if that

7    scenario you described comes into play we'll file a motion.

8         THE COURT:  All right.  Anything else?

9         MR. LENNON:  No, Your Honor.

10        THE COURT:  And I am going to go ahead and impose that

11   as the sentence of the Court, Mr. Boden, a custodial term of 30

12   months, followed by the three years of supervision on the terms

13   indicated.  The fine waived, but the money judgment of

14   forfeiture of $75,000 entered along with the specific

15   forfeiture of the various virtual currency and a $300 special

16   assessment.  I am going to impose that now but make it the

17   written judgment of the Court as well.  You then have 14 days

18   to appeal.  So you tell Mr. Lennon if there is anything you

19   want to appeal.  He puts the notice on file.  And you think

20   about it with him.  You can always pull it back.  But if day 15

21   comes and you say, you know, I wish I would have appealed, it's

22   too late.  Okay.  So you talk with him about that.  You make

23   sure you are satisfied with your decision, whatever it is.

24        Then, as we already said, my intention is to have you

25   self report, not remand directly to the marshal.  So that means

1 at some point, probably weeks, it's usually not months and it's

2 usually not days, the BOP will say, here is where you need to

3 be and when, and then you need to get to that place.  Do you

4 have any questions about that?

5    THE DEFENDANT:  Is there any possible way I can get

6 assigned somewhere locally?

7    THE COURT:  Yeah.

8    THE DEFENDANT:  Travel and I are really bad.

9    THE COURT:  I was going to ask about that.  So the

10 closest federal prison is in Milan, Michigan.  Maybe that's the

11 right setting for you.  Maybe not.  There are other places

12 that, you know, have lower security, for example, but they are

13 farther away.  So I am happy to ask for something close if

14 you'd like that, but it may or may not be the place you'd most

15 like to wind up or the place that the bureau would think you

16 best fit.

17    THE DEFENDANT:  Yes, sir.

18    THE COURT:  So I don't know, have you had a chance to

19 talk with him about that, Mr. Lennon, and do you have a view

20 one way or the other?

21    MR. LENNON:  Yes, Your Honor.  And I think, you know,

22 it goes both ways.  He has some serious issues about traveling,

23 but I think it's better to address that in 30 months at a place

24 that's lower security.  I have been to Milan and that's just --

25 I don't think that's the appropriate setting for him.

1          THE COURT:  I can think of places that would be more

2    fitting, too.

3          MR. LENNON:  Yes, Your Honor.  We'll try to figure out

4    how to get him there.  We'll get him there.  And I think that's

5    better.  I think closest, though, would actually -- allows the

6    Bureau of Prisons to decide what is best for him and closest.

7          THE COURT:  Okay.  So closest within the overall grid?

8          MR. LENNON:  Yes, Your Honor.

9          THE COURT:  Okay.  Anything else from the Defense?

10          MR. LENNON:  No, Your Honor.  Thank you.

11          THE COURT:  Mr. Presant?

12          MR. PRESANT:  No.  Thank you, Your Honor.

13          THE COURT:  Okay.  Thank you.

14          THE CLERK:  Court is adjourned.

15          (Proceeding concluded, 4:49 p.m.)

REPORTER'S CERTIFICATE


I, Paul G. Brandell, Official Court Reporter for the
United States District Court for the Western District of
Michigan, appointed pursuant to the provisions of Title 28,
United States Code, Section 753, do hereby certify that the
foregoing is a full, true and correct transcript of the
proceedings had in the within entitled and numbered cause on
the date hereinbefore set forth; and I do further certify that
the foregoing transcript has been prepared by me or under my
direction.



                    /s/ Paul G. Brandell
                    Paul G. Brandell, CSR-4552, RPR, CRR
                    U.S. District Court Reporter
                    399 Federal Building
                    Grand Rapids, Michigan  49503